In our attempt to correctly decide this case, we have failed to find a reported case involving a factual situation sufficiently similar to be considered an authority for the exact propositions here ruled. However, for discussions of the underlying principles decisive of the questions here involved, see: Stevens v. St Louis, M. B. T. Ry. Co., 152 Mo. 212, 53 S.W. 1066; Eureka Real Estate & Inv. Co. v. Southern Real Estate & Financial Co., 355 Mo. 1199, 200 S.W.2d 328, 330[1–3]; Hatton v. Kansas City C. & S. Railway, supra; Raleigh C. & S. Ry. Co. v. McGuire, 171 N.C. 277, 88 S.E. 337, 339; Atlantic Mills, Inc. v. N. Y. Cent. R. Co., 126 Misc. 349, 214 N.Y.S. 123, 128[9, 10]; Green v. Penn R. Co., 141 Md. 128, 118 A. 127, 128[1, 2]; Cohn v. San Pedro, L. A. & S. L. R. Co., 103 Cal.App. 140, 284 P. 1051; Summerill v. Hunt, 55 A.2d 833, 838[4], [5], 25 N.J. Misc. 498; Pennsylvania Co., etc. v. Cincinnati & L. E. R. Co., D.C.S.D. Ohio, W.D., 43 F.Supp. 5; 30 C.J.S., Eminent Domain, § 451(c), p. 209, § 454, p. 215, § 458, p. 217; 74 C.J.S., Railroads, § 117, p. 541; 18 Am.Jur., Eminent Domain, § 127, p. 750; 44 Am.Jur., Railroads, § 105, p. 320, §§ 107, 108, p. 322.

The judgment is reversed with directions to enter judgment in accordance with the views herein expressed.

VAN OSDOL and LOZIER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.

FERGUSON et al. v. STOKES.

No. 43731.

Supreme Court of Missouri.

Division No. 1.

June 14, 1954.

Motion for Rehearing or to Transfer to Court en Banc Denied July 12, 1954.

Henri Sursa, Fredericktown, Finley, Lucas & Arnold, Ralph T. Finley, St. Louis, for appellants.

Harry Gershenson, St. Louis, Melvin Englehart, Fredericktown, for respondent.

LOZIER, Commissioner.

This is an action to determine title to and declare a resulting trust in real estate. Plaintiffs-appellants (herein called plaintiffs) appealed from a judgment sustaining, at the close of plaintiffs' case, defendant's motion to dismiss the petition and entering judgment and decree "on the merits in favor of defendant and against plaintiffs".

Plaintiffs contend that the trial court erred in dismissing their petition and in rejecting certain evidence offered by them. (In their original brief, plaintiffs also contended that "the judgment is not responsive to the pleadings and evidence" in that it did not recite that title was in defendant and not in plaintiffs. However, in their reply brief, plaintiffs concede that the judgment "was a final judgment and disposed of all issues, otherwise we could not have appealed." In view of which—and noting that defendant asked no affirmative relief—we need not rule plaintiffs' contention as to the form of the judgment.)

In their reply brief, plaintiffs argue: "On appeal, where the question is whether plaintiff made a submissible case, the court will consider only the evidence most favorable to the plaintiff-appellant, and disregard any evidence for the defendant." However, in an equitable action, the appellate court tries the case de novo.

The real estate is a lot on Newberry Street in Fredericktown upon which a house was built in 1948. By a warranty deed executed December 9, 1946, and recorded May 13, 1948, O. J. Ferguson and his wife, Anna, conveyed the lot to Sidney Stokes and Edna Stokes, his wife, an estate by the entirety. Edna died on April 26, 1951, survived by Sidney, defendant-respondent (herein called defendant) and no descendants. Plaintiffs are Edna's collateral heirs. (In this court, Anna Ferguson, widow of plaintiff O. J. Ferguson, who died after the trial, and executrix and sole devisee and legatee under his will, was substituted as a party plaintiff.)

Plaintiff Cora King, Edna's sister, testified that: Sidney and Edna Stokes had been married for about 12 or 12½ years (in 1938 or 1939); they lived with Edna's parents for about 2 years and in St. Louis City probably 2 or 3 years; Edna taught school in St. Louis County until they moved to De Soto; they later returned to Fredericktown; for about 2 years before Edna's death, they had lived in the Newberry Street home (built in 1948) and Edna taught school. In August or September, 1950, Cora noticed that Edna "was failing." Edna and Sidney lived in Cora's home 8 of the 9 weeks before Edna's death (the other week Edna was in the hospital). Cora said that she saw Edna often when they (the Stokeses) "lived here in Fredericktown. * * * She was at my house almost

every day as long as she was able to come down."

The trial court struck out these portions of Cora's testimony (given over objection): Edna and Sidney "didn't get along at all, and she was very unhappy. She told me so not only once but almost every day she was. She would come home from school and sit and cry and tell me how Sid treated her and tell all about this, conversations that sisters would have"; that Sidney was "away from home practically all the time through the week." (Note that Cora was obviously speaking of times after the Stokes' return to Fredericktown—a date not shown in the record—and, apparently, of times after the Stokeses had moved into the Newberry Street home.) Asked what she had "seen and heard * * * prior to December 9, 1946 (the date of the deed), as to how Sidney treated Edna," Cora said: "Well, it was just the same old story and it had been that way for years. * * *

"Q. Tell what it was. A. Well, he would just go off and leave her and be gone, and when he came in and sometimes she would ask, 'Where are you going, Sidney?' and he just looked off and he would say, 'What you don't know don't hurt you,' and sometimes when he come home, it was the same answer. * * *

"Q. Was that often? A. Pretty often. * * *

"Q. How many times did you hear that, approximately? A. Almost every week end, if I happened to be up there. * * * I wasn't there every week end."

Plaintiff O. J. Ferguson, Edna's brother and the husband-grantor in the deed, testified: According to his best recollection, the $700 consideration was paid by Edna, partly in cash on one occasion and partly by a check on another, and that Sidney paid no part thereof. Asked, "What did you do with reference to having the deed made," Ferguson replied: "My memory isn't very clear on that. I was having a number of deeds made along about that time.

"Q. Did you make any directions? What did you tell the person—whom did you ask to draw the deed? A. Mr. Englehart (a lawyer in Fredericktown).

"Q. He drew all your deeds? A. Yes.

"Q. And what did you tell him? A. I am not sure. I don't know. * * *

"Q. Did Sidney Stokes ever approach you about buying this property * * *? A. No.

"Q. Who did your sister say was buying the property, or did she say? A. No. * * *

"Q. Did you ever have a conversation with anybody about making the deed to the husband and the wife? A. No. * * *

"Q. Did you have a conversation with your sister after you had given instructions to Mr. Englehart as to how the deed should be made? A. I am not sure. * * *

"Q. I mean within a day or two before the thing was closed? A. Yes.

"Q. What was said about it? A. When she either made me the first cash payment or the final payment by check, she said, 'Now, will it be necessary to get a bank loan,' and she said, 'Will I be able to get that unless both our names are on it?'

"Q. On the what, the deed? A. On the deed, and I said, 'I don't know,' and I said, 'You had better consult an attorney,' or perhaps I said to consult one. I don't remember about that. I answered previously that I thought she would be able to obtain a loan, but I didn't know anything about the requirements as to title." So far as Ferguson knew, Edna was not "ever experienced in real estate transactions other than this transaction here."

Ferguson said that, as a member of the bank's discount committee "which passed on loans" at that time, he knew that Edna "got a loan" from the bank. (There was no evidence as to the terms of the loan. There was evidence that in 1949 Edna paid the bank $598.44 by one check, but for what does not appear, and in 1950, $145 by 3 checks, each marked "for interest on $5,400 loan." Apparently, the note was signed by

Edna alone and was not secured by a deed of trust on the Newberry Street home.)

Ferguson "did not recall" going to Englehart's office "in regard to the preparation of this deed * * * and "sitting down and helping to work out the description on it." He was not sure that, when he executed the deed, the names of the grantees were already written in. However, he owned "a great deal of land in this town, had made many conveyances such as this and was not in the habit of signing deeds without reading them"; he wouldn't sign a deed without knowing the description of the lot. Asked if he had left the deed with Englehart to be delivered to Mrs. Stokes, he said, "I can't even remember that."

The trial court sustained defendant's objection to the question as to what Ferguson knew about Sidney's financial status at the time the bank made the loan to Edna. Plaintiffs' offer was that Ferguson would testify that Sidney "would be unable to borrow money from the bank except on security, and that he was insolvent, at least he had no property, at least with which to buy property, and that he owned no other property out of which he could raise money to pay off a loan."

Plaintiff Andrew Ferguson, Edna's brother, testified that: He and Sidney "were not 'very friendly,' let's just say 'friendly.'" Sidney (and Edna, apparently) stayed at Andrew's home while the house was being built in 1948. During that time, he had 2 or 3 conversations with Sidney in which Sidney told him "it was my sister's house and he was building it for her and that there would be a lot of things he would build differently if it was his. She was the boss; it was her property and he was building it to suit her." Andrew discussed the matter with defendant because he was interested in seeing that his sister was satisfied with the house. He was on the site 3 or 4 times and saw defendant there every time.

Plaintiff's other evidence was as to matters subsequent to the execution and delivery of the deed, viz.: Edna's bank statements between January 26, 1948, and March 28, 1950 (which show neither the source of the deposits nor the purposes for which the withdrawals were made); Edna's cancelled checks written between February 28, 1949, and August 26, 1950, for utilities bills for the home and for groceries and miscellaneous items; Edna's cancelled checks, written between March 29, 1948, and August 7, 1950, for items of labor and materials for the construction of the home, including some to Sidney personally (which, under the other evidence, were in payment of his supervision of the construction); Edna's cancelled checks, written between November 29, 1946, and July 26, 1950 for 1949 city and county taxes on the home, for "interest on $5,400 loan" (one to the bank, dated February 2, 1949, for $598.44 bore no notation), for insurance on the home and one dated September 7, 1948, "for abstracts"; a set of plans bearing the notation, "House for Mrs. Edna Stokes—Sidney Stokes, Architect."

The trial court excluded evidence that Sidney, as administrator of Edna's estate, had secured allowance of, and had paid out of the estate, claims for Edna's medical and drug bills and funeral expenses; that he had not initially charged himself with Edna's automobile and a $326.20 check due her under the public school retirement system, and had charged himself with those items only after being cited (in 1952).

Plaintiffs seek to establish a "resulting" trust as distinguished from a "constructive" trust. See 54 Am.Jur., Trusts, Sec. 188, p. 147; Restatement, Trusts, p. 1249 and Restitution, Sec. 160, p. 643; Bogert, Trusts, Secs. 451 and 471. As plaintiffs neither alleged nor offered evidence of fraud or unconscionable conduct on the part of defendant or any other participant, no "constructive" trust is involved.

■ "A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein, unless the inference is rebutted or the beneficial interest is otherwise effec-

tively disposed of. * * * A resulting trust does not arise where a transfer of property is made to one person and the purchase price is paid by another, if the person by whom the purchase price is paid manifests an intention that no resulting trust should arise." Restatement, Trusts, Secs. 404, 441, pp. 1250, 1347.

As between strangers, a purchase-money resulting trust arises against the grantee of real property in favor of the payor of the purchase money unless it was the payor's intent that no such trust should arise; but the presumption of a resulting trust is rebuttable. Restatement, Trusts, Secs. 440, 441, pp. 1343, 1347; Bogert, Trusts, Sec. 454, p. 419. And see 6 Mo.Law Review, 354. This presumption is based upon the sound principle that, absent evidence to the contrary, it is not the intent of any such payor to make a gift to the grantee. See Carr v. Carroll, Mo.Sup., 178 S.W.2d 435, 436[2]. But "where a husband purchases real estate with his own funds and causes the same to be conveyed to his wife, it will be presumed the husband intended the conveyance as a provision for his wife, and a trust will not result. * * * The same is true where title is taken in the name of both husband and wife and an estate by the entirety is created." Hiatt v. Hiatt, Mo.Sup., 168 S.W.2d 1087, 1090[7–9]. And see Thieman v. Thieman, Mo.Sup., 218 S.W.2d 580. 583[1]; 6 U. of Mo. Bull. L. Ser. 40.

"The courts are not united on the position which should be taken where a wife proves that her funds paid for realty * * and that with her consent the conveyance ran to the husband. A majority of the decisions hold that the presumption to be applied in such a case is one of a resulting trust for the wife and not of gift to the husband. But a respectable minority take a contrary view and presume a gift to the husband." Bogert, Trusts, Sec. 460, p. 488. In Haguewood v. Britain, 273 Mo. 89, 199 S.W. 950, 951[1, 2], this court said: "It is generally held that, if the wife pays the price and the title is taken in the name of both husband and wife the law infers an intent of the wife to confer an interest by the entireties upon the husband, and no trust will arise in the absence of proof that one was intended. * * '* There are decisions which impose upon the husband the burden of showing an intent that a trust shall not arise from the wife's purchase and the taking of title in the names of both."

It may be that the reasons for the presumption of a resulting trust in favor of the wife (her former inferior economic status, her disabilities as to her separate property and the theoretical domination of the wife by the husband) have disappeared. It may be that the Married Woman's Acts, see Sections 451.250 to 451.300 RSMo 1949, V.A. M.S.; Schwind v. O'Halloran, 346 Mo. 486, 142 S.W.2d 55, loc.cit. 58[5] infra, and the present position of married women in financial, commercial, business, industrial and professional spheres render purely arbitrary the contrary presumptions as to the wife-payor and the husband-payor. And, in the absence of evidence · to the contrary, we certainly cannot assume that the wife does not have the same love and affection for her husband as he has for her. And while the wife has no legal duty to support her husband, we cannot assume that (again, absent evidence to the contrary) she has no inclination or desire to assist her husband in financial matters, or to make gifts or confer benefits upon her spouse. See Annotation, 113 A.L.R. 339; 16 Ill.Law Review, 529.

In any event, "the type of presumption to be applied to husband or wife as payor is not usually a matter of vital importance. In most cases the other evidence will clearly show a gift or a trust." Bogert, Trusts, Sec. 460, p. 493. We do not believe that, in the instant case, the presumption to be applied is decisive. "It is unnecessary to discuss the relative soundness of these somewhat varient views because, in this case, the evidence and the court's findings satisfy the requirements of the rule most favorable to appellants." Haguewood v. Britain, supra, 199 S.W. loc. cit. 951 [1, 2].

"Plaintiffs are attacking the deed, therefore, the burden of proof is upon them." Milligan v. Bing, 341 Mo. 648, 108 S.W.2d 108, 109[3]. We believe that plaintiffs failed to sustain their burden of proof.

In Haguewood v. Britain, supra, as in the instant case: The wife bought a home, paid the consideration and caused the deed to be made to herself and her husband by the entirety; she was survived by her husband and no descendants; her heirs at law sued the husband to establish a resulting trust. We said: "The doctrine that a resulting trust arises 'from the payment of price by one person and taking title in the name of another finds its sanction in the theory, which courts of equity adopt, that such a trust probably expresses the intention of the parties to the transaction. But equity neither creates nor enforces such a trust contrary to the ascertained intent of parties capable of acting for themselves.' Morris v. Clare, 132 Mo. [232] loc. cit. 236, 33 S.W. 1123; Morford v. Stephens [Mo.Sup.], 178 S.W. 441. In the circumstances, Mrs. Britain could have taken title in her own name and then, under the statute [now Section 451.290 RSMo 1949, V.A.M.S.] as construed in numerous decisions * * * lawfully could have conveyed to her husband without the intervention of a third party * * *. She was entirely 'capable of acting for herself' in the premises, and her intent becomes important. The trial court found that Mrs. Britain closed the negotiations for the property, consulted lawyers as to the best method of securing her husband in the enjoyment of the property in case of her own death, deliberately, after the matter was explained, chose to have the property conveyed as she did in preference to taking the whole title and providing for her husband by will, then paid her money and accepted the deed in the form in which she had had her own attorney prepare it. The court's finding on these matters is fully supported by the record. These facts not only fail to warrant a presumption of a trust, but they conclusively exclude any possibility that such thought was in the mind of any of the parties." 199 S.W. 950[1].

In Lehr v. Moll, Mo.Sup., 247 S.W.2d 686, 689[2], this court restated the rule that a " 'resulting trust must arise, if at all, at the instant the deed is taken. Unless the transaction is such that the moment the title passes the trust results from the transaction itself, then no trust results. It cannot be created by subsequent occurrences.' "

■ The instant record does not show whether Edna consulted a lawyer, as suggested by her brother, O. J. Ferguson. Otherwise, the circumstances are almost identical with those in Haguewood v. Britain, supra. The common significant factors are: The husband had absolutely no part in the transaction; the wife did not discuss the matter with her husband but did with others; after consideration, the wife deliberately chose to have the property conveyed to herself and her husband instead of to herself alone. We believe that the most important factor is, not that Edna may not have understood all of the legal incidents of an estate by the entirety, but that she considered whether to cause the title to run to her alone or to her and her husband jointly; and then, after considering the matter (and without having given, by word or action, the slightest suggestion from which it may be inferred that she intended a resulting trust) directed the conveyance by the entirety. The husband-payor who purposely causes the property to be conveyed by the entirety, cannot thereafter contend that his intent was other than to create such an estate or that he did not understand the effect of such a conveyance, or "that the deed should not have the full effect the law affixes to it." Fulbright v. Phoenix Insurance Co., 329 Mo. 207, 44 S.W.2d 115, 118[2, 3]; Hernandez v. Prieto, 349 Mo. 658, 162 S.W.2d 829, 831[6]; Schwind v. O'Halloran, supra, 142 S.W.2d loc. cit. 58[2–6]. The same principle should be (and we rule that it is) equally applicable to the wife-payor who, having considered this precise matter, voluntarily elects to

cause the conveyance to run to herself and her husband.

Here, an intelligent woman, a school teacher, purchased the lot from her real estate-banker-brother. Plaintiffs' evidence as to the drafting, execution and delivery of the deed was the testimony of O. J. Ferguson above summarized. Although he could not recall the details, he clearly established that: He and she discussed whether the title should run to her alone or to her and her husband; he advised her to consult a lawyer (as stated, the record does not show whether she did). Thereafter, he, at her request or, at least, with her knowledge and authorization, instructed Englehart, his attorney (who drew all of his deeds) to draw the deed conveying to the Stokeses by the entirety; Englehart did so, returned the document to Ferguson, the Fergusons executed it and Ferguson returned it to Englehart who then delivered it to Edna.

The evidence as to events subsequent to Edna's acceptance of the deed (of interest only as bearing upon Edna's intent in causing the deed to be executed as it was) supports the conclusion that she did not intend a resulting trust. She did not record the deed until 17 months after it had been delivered to her. She lived with Sidney until her death, 4½ years later. There was no evidence that she ever discussed the matter with Sidney or anyone else, much less ever questioned the correctness of the deed in any respect or requested Sidney to transfer to her the sole title or filed a suit for that purpose.

Plaintiffs' cited cases [1] are inapplicable in that they did not involve conveyances to a spouse or did involve alleged fraud or conveyances caused to be made by the husband in violation of the directions of the wife (whole or part consideration-payor). Nor is Section 451.250, subd. 2, RSMo 1949, V.A.M.S., cited by plaintiffs, applicable as the expenditure of the instant wife's money was not made by the husband.

Plaintiff contends that in three instances the trial court erred in excluding evidence. In trying the case de novo and in reaching our conclusion, we have considered the excluded evidence in the two instances in which the evidence appears in the transcript. (1) Cora's stricken testimony ("showing," according to plaintiffs, "that Mr. and Mrs. Stokes were not living happily together") has little, if any, probative value. (2) The evidence as to Sidney's handling of Edna's estate has no possible relevancy as to her intent when she paid the consideration and caused the deed to be executed. In the other instance, (3) the chancellor rejected this offer of proof: At the time of the execution of the deed, Sidney had no funds or property, could not get a loan from the bank and paid no part of the consideration for the lot. The only possible value of that evidence was its corroboration of the fact that Edna paid the entire consideration. Inasmuch as that circumstance was established by other evidence, and inasmuch as we have considered that circumstance to be a fact, no prejudice resulted to plaintiffs because of the rejection of the evidence.

The judgment is affirmed.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.

All concur.

1. Such as: Robertson v. Woods, Mo. Sup., 263 S.W. 135; Carr v. Carroll, Mo. Sup., 178 S.W.2d 435; Woerheide v. Kelley, Mo.Sup., 243 S.W. 158; Milligan v. Bing, 341 Mo. 648, 108 S.W.2d 108; Sanders v. Sanders, 357 Mo. 881, 211 S. W.2d 468; Schwind v. O'Halloran, 346 Mo. 486, 142 S.W.2d 55; Sutorius v. Mayor, 350 Mo. 1235, 170 S.W.2d 387, 171 S. W.2d 69.