Margaret S. DALLMEYER, Respondent,

v.

Robert E. DALLMEYER, Appellant.

No. 44006.

Supreme Court of Missouri.

Division No. 1.

Jan. 10, 1955.

Ira H. Lohman, Jefferson City, for appellant.

Hendren & Andrae, By: Henry Andrae, Jefferson City, for respondent.

LOZIER, Commissioner.

Plaintiff-respondent wife (herein called plaintiff) sued defendant-appellant (herein called defendant) for divorce, custody of their minor son and for alimony in gross. Defendant answered, denying that plaintiff was entitled to a divorce, custody of the son and alimony. The trial court found that plaintiff was the innocent and injured party, granted her a divorce and custody of the son, but denied her alimony and attorney's fees. Upon this appeal, the propriety of the trial court's findings and conclusions as to any of those matters is not involved.

The real issue here is, and below was, made by defendant's cross-claim wherein he pleaded resulting trusts in three real properties, 1,318 shares of a bottling company stock, and 9 shares of bank stock. The trial court ruled that issue adversely to defendant. Defendant appealed.

■ This court has jurisdiction of the appeal, both because title to real estate is involved and because of the amount in dispute. Art. V, § 3, Const., 2 V.A.M.S.

■ We review this equity case de novo upon the record made below, giving due regard to the trial court's better opportunity to judge the credibility of the witnesses.

The parties were married in 1929 and separated in 1952. They have two sons, 22 and 18 years old at trial time (1952–1953). It was conceded that plaintiff had no property at the time of her marriage, and had thereafter inherited no property.

On April 6, 1937, defendant caused the Vineyard Square property (the home), the title to which had theretofore been in his name, to be conveyed to plaintiff and defendant by the entirety. On September 16, 1937, he caused the Washington Park property, and on April 1, 1947, the Crestview property, to be conveyed to her individu-

ally. Between September 10, 1938, and December 14, 1949, he caused to be issued in their joint names 839 shares, and in her name, 479 shares, of bottling company stock. On December 3, 1948, he caused to be issued in her name 9 shares of bank stock.

Defendant pleaded that, in causing the transfers to be made, "it was not his intention to make gifts to plaintiff; that his intention was that the equitable title should not pass to plaintiff but that she should hold it in her name as trustee for defendant * * * and not as her own property"; it "was at all times the intention of both parties * * * that defendant should have equitable title to the" Vineyard Square and Washington Park properties; "it was understood" that the Washington Park property "was to be improved" and that the Crestview property was "put in plaintiff's name until such time as it could be subdivided and sold to advantage." Defendant alleged that all transfers of stock were made "clearly as a matter of convenience," as defendant was an officer of the bottling company and a director of the bank. In her answer to the cross-claim, plaintiff alleged that all of the transfers were made by defendant upon the express understanding, in each instance, that the property was "to be plaintiff's property alone" and that defendant caused the transfer to be made "as a gift and provision for plaintiff."

The greater portion of the transcript consists of evidence as to past and present values of the properties and as to defendant's business difficulties and financial status at various times after 1936. One of the trial court's findings of fact and conclusions of law was that the transfers of the properties by defendant were "part of an effort * * * to avoid, hinder, delay and defraud his creditors" and that he did "not come into equity with clean hands." However, we need neither summarize the evidence as to those matters nor rule the propriety of that finding and conclusion. This, because our study of the record has convinced us that the trial court properly

found and ruled that the transfers were gifts and that, at the time of each transfer, defendant did not intend to create a resulting trust.

For the same reason, we need refer but briefly to the evidence as to the financing and management of the real properties, as to defendant's "voting" the stock and using the dividends thereon, or as to other business or financial agreements or transactions, after the times of the transfers, between either the parties themselves or between them and third persons.

Plaintiff testified that in 1937 defendant told her about having had the Vineyard Square property conveyed to him and her and stated that their home was "jointly owned." At the trial, defendant said that, at the time he caused the transfer to be made, "it was my understanding that it (the home) was to be the joint property" of the parties. In this court, defendant has abandoned his claim of a resulting trust in the home. (In his brief he states that the home "has been sold and is no longer in controversy.")

These facts are undisputed: Plaintiff paid no part of the consideration for any of the stock or for either the Crestview or Washington Park properties or any part of the cost of any building constructed thereon; defendant platted the Crestview property, constructed six houses and a barn and drilled a well thereon; he constructed a building on the Washington Park property; he managed, paid the taxes, insurance and interest upon, and collected the rents from, the Crestview property (all with plaintiff's permission and consent) until November 1952 and the Washington Park property until sometime in 1950 or 1951, at which times, respectively, plaintiff "took over" control and management; he arranged for the financing and refinancing of the two real properties. It was also undisputed that defendant "voted," and received and cashed the dividend checks on, the bottling company and bank stock.

Defendant testified that, when he purchased the Washington Park property, he "put it in Mrs. Dallmeyer's name to have it for our children." Sometime in 1950, he had an offer for the property, and talked to plaintiff about it "and I told her I wouldn't sign a deed for that amount of money." As to the Crestview property, defendant testified that plaintiff "looked at it with me and we agreed to buy it. * * * I placed that deed in Mrs. Dallmeyer's name in order for us to have it for our children."

As to the bottling company stock, defendant said that plaintiff had, on August 29, 1945, endorsed in blank the two certificates for the 479 shares issued to her individually; she and he had, on January 27, 1950, endorsed in blank one certificate for 240 shares issued to her and him jointly; he put those three certificates in his deposit box, to which she had access. "It was our mutual understanding that that stock was to be held by me for the benefit of our two sons * * * and it would never be hypothecated in any way. * * * The agreement was that I was to keep the stock as long as I lived and it would go to our children. * * * I don't know we had any agreement as to the dividends but I always took them and cashed the checks, without any objection on her part."

At one hearing, defendant was asked:

"Is it your position that this property was to remain in Margaret Dallmeyer's name as long as you were not divorced? A. What property?

"Q. All these various pieces of property, including the [bottling company] stock, is that your position? A. That is it."

At a subsequent hearing:

"Q. Mr. Dallmeyer, I asked you at the last hearing * * * whether it was your position that the property was to remain in Margaret's name a long as you were not divorced and your answer was, 'that is right' or 'that is correct.' Is that still your answer? A. I believe that is correct.

"Q. You had an understanding then that if there was any divorce this property

was to be returned to you, is that correct? A. No, sir, I never expected a divorce.

"Q. It was your expectation that if there was ever a divorce the property would be returned to you, is that correct? A. That is correct.

"Q. Was it your position that she was to go through some sort of an understanding and return it to you? A. Yes, I believe it is.

"The Court: You say that is your understanding? A. That is my understanding.

"Q. [by plaintiff's counsel]: That was your understanding with Mrs. Dallmeyer, is that correct? A. That was my thought on the matter.

"Q. I mean, do you have such an understanding? A. We had no verbal understanding.

"The Court: You mean you didn't speak of it, is that what you mean? A. That is correct."

Plaintiff testified that all of the transfers, some of which were made without her prior knowledge, were gifts. She went with him when the Crestview property was purchased, he consulted her about it and she knew "it was being put in my name. * * * He spoke of 'your property' and to other people, 'Margaret's farm.' * * * That was from the beginning on." While he was subdividing and building houses on the property, "he asked me to go out all the time and I was always under the impression that they were mine. * * * He always said, 'Your farm, your houses, your barn.' I don't know that he said 'your barn' because he used it for his horses."

Plaintiff said that she allowed defendant to manage the two real properties and collect the rents. Prior to the time she "took over" the Crestview property, she "had to pay for some repairs," and defendant always consulted her about repairs on the Washington Park property. Once he told a tenant in the latter property, " 'You will have to decide with Margaret what should be done,' and I did not want to spend the money to do it. * * * I have spent money since I managed the property." Plaintiff had to take over the management of the properties when the owners of notes secured by deeds of trust "got on me because the property was mine," and there was a possibility of foreclosure. Defendant did not resist her "taking over." In November, 1952, in his lawyer's office, he handed her the notes and deed of trust books, saying, "Here are your building and loan books."

When the bottling company stock was issued, defendant told plaintiff that it was issued either to her individually or to them jointly. She remembered endorsing the certificates. She said that she claimed the stock, "I took great pride in it. * * * Mr. Dallmeyer put it in my name for what reason I don't know except I was supposed to be part owner in the company." If his purpose was to prevent collection of any judgments which might be rendered against him, she knew nothing about it. The certificates were kept in their joint deposit box in "an envelope with my name on it." Once, when defendant talked of selling the company, "I said I did not approve, that I wanted to keep it, * * * that is one piece of property that was going to be kept clear."

At the time or sometime after the bank stock was issued, plaintiff said, defendant "told me that we owned 9 shares jointly. I suppose Mr. Dallmeyer bought them. I had no money. He would be the only one to buy them."

These principles are well established: A resulting trust is created at the time title is transferred, not by subsequent occurrences. Ferguson v. Stokes, Mo., 269 S.W.2d 655, 660[4]. Where the husband pays the consideration and causes the transfer to be made to the wife, the rebuttable presumption is that he intended to make a gift or a provision for her benefit. Jacobs, v. Jacobs, Mo., 272 S.W.2d 185, 188 [8]; Hiatt v. Hiatt, Mo., 168 S.W.2d 1087, 1090[7–9] (transfer to husband and wife by the entirety). The burden of proof is upon the party challenging the transfer.

Milligan v. Bing, 341 Mo. 648, 108 S.W.2d 108, 109[1–4]. "Parol evidence to establish a resulting trust must be so clear and convincing as to leave no doubt in the mind of the court as to its existence." Darrow v. Darrow, Mo., 245 S.W.2d 834, 837[2, 3].

Agreeing that such principles are applicable, defendant contends that he has sustained his burden of proof. He relies almost entirely upon the evidence that, after each of the transfers, he "at all times retained control, and collected the rents with respondent's permission, collected the dividends and kept them for years afterwards, made all the repairs, managed all of the properties, paid the taxes and insurance, and these facts are all admitted and they clearly overcome the presumption that it was a gift. * * * While much of the evidence, such as acts and conduct of the parties, was after the transfers were made, yet it shows that at the time the deeds were taken and the property transferred none of it was intended as a gift either by defendant or plaintiff." All of which, argues defendant, "negatives the fact that at the time the properties were transferred it was intended that plaintiff should have the title thereto, * * * negatives any intention to transfer title and clearly overcomes any presumption of a gift."

■ The conduct of the parties *after* the transfers of title—such as the management of the property by the husband-payor (of the consideration), collection of rents and payment of taxes and insurance, with the acquiescence of the wife—is evidence tending to rebut the presumption of an intended gift. See Restatement, Trusts, Sec. 443, Comment *a*, p. 1358, cited by defendant. But such evidence is not conclusive as to the husband-payor's intent *at the time* he caused title to be put in his wife's name. Indeed, such evidence is of little weight where the overwhelming weight of the other evidence—and, especially, the evidence as to circumstances *at the time* of the transfer—supports the presumption of an intended gift to the wife.

■ Returning to the testimony as to defendant's intent at the time of the transfers. The trial court expressly found that plaintiff was a more credible witness than defendant. We defer to that finding. Balch v. Whitney, Mo., 273 S.W.2d 497. Furthermore, we believe that defendant's own testimony not only fails to negative the presumption of gifts to plaintiff, but clearly negatives his theory of resulting trusts. We need here emphasize only: Defendant never testified that, at the time of any one of the transfers, it was his intention that plaintiff hold the legal title for him or for his benefit; he put the Washington Park property in her name "to have it for our children"; it was only *his* "understanding" or "thought" that she would return all of the properties to him in the event of a divorce, but he and she had "no verbal understanding" and he never mentioned his "understanding" or "thought" to plaintiff. We find that defendant, by failing to offer clear and convincing evidence of his intent to establish resulting trusts, has not rebutted the gift presumption and, hence, has failed to sustain his burden of proof as to his cross-claim. We so rule.

In Count 6 of his cross-claim, defendant alleged that, in the event plaintiff was adjudged to be the owner of the Crestview property, he should have judgment against her for $9,498.65 with six per cent interest from August 27, 1952, and to have same declared a lien against that property. At the trial, it was conceded that defendant's claim in Count 6 covered only Lots 5 and 6, Crestview property. On August 27, 1952, defendant paid $9,498.65, the balance then due on a $12,000 note executed by the parties on October 11, 1947, and caused the securing deed of trust (covering all of the Crestview property, including Lots 5 and 6) to be released of record. On the same day, the parties refinanced an $18,000 loan on the Washington Park property. Defendant alleged that he paid the $9,498.65 in pursuance of this agreement with plaintiff: If he would join her in refinancing the Washington Park property loan, she would join him in refinancing the existing loans on Lots 5 and 6. Defendant alleged

256

that plaintiff failed and refused to refinance the two lots and that, therefore, he was entitled to be subrogated to the rights of the holder of the $12,000 note to the extent of $9,498.65. In her answer to the cross-claim, plaintiff denied the existence of the alleged agreement.

Defendant testified that he borrowed $10,000 from a St. Louis bank "to pay off" the balance due on Lots 5 and 6. He was intending to refinance the other lots and she "agreed to that * * * and then came the separation and nothing further came up about it. * * * That was when we agreed to send Billy (their youngest son) to school at Western Military Academy; we didn't have sufficient money to do it and Mrs. Dallmeyer wanted to refinance the" Washington Park property. "And I agreed to sign that mortgage with her provided she would agree to refinance" all of the Crestview lots, "but circumstances came around so that we never could finance" them.

Plaintiff testified that she received $1,417.52 difference between the old and the new $18,000 loan on the Washington Park property and used it to pay Billy's tuition at the military school. She denied that she had agreed with defendant, in consideration of his joining her in the $18,000 loan, she would join him in refinancing Lots 5 and 6. She did not know that he had borrowed the $10,000 from the St. Louis bank "until after he had borrowed it." (She said that she did agree to join him in refinancing Lots 2 and 3 and that they did refinance those lots. Counsel agreed that Lots 1, 2, 3 and 4 had been refinanced prior to August 27, 1952.) "If he intended to have me enter into some future agreement with him and refinance" Lots 5 and 6 "so he could get his" $10,000 "back, don't you think beforehand he could have consulted me? * * * He did not."

Again, we believe, defendant has failed to sustain his burden of proof as to the existence of an agreement with plaintiff. We so rule.

Defendant says that Count 6 is "one for money paid as surety." He argues that if plaintiff is held to be the owner of Lots 5 and 6, she "is the principal debtor and defendant is merely surety for her; that being true as a matter of law, without the aid of equity, defendant is entitled to judgment in accordance with Sections 433.050 and 433.060, RSMo 1949, V.A.M.S."

However, those sections (providing that a surety may recover from his principal money paid or the value of property delivered, with interest, by him in satisfaction of his principal's obligation) do not aid defendant. This, because defendant was not a surety. The $12,000 note (the $9,498.65 balance due upon which defendant paid on August 27, 1952) and the securing deed of trust were executed October 11, 1947. (This was a little over six months after defendant bought the Crestview property and caused it to be conveyed to plaintiff. Apparently, the proceeds of that loan were used by defendant in developing the entire subdivision which he thereafter, until November 1952, managed and collected the rents therefrom.) On the face of that note and that deed of trust, plaintiff and defendant were both principals and each executed each instrument as principal, not as surety ("we promise to pay," "we agree for ourselves, our executors or administrators" etc.). The assignment is overruled.

The judgment and decree is affirmed on the ground that the transfers were gifts of the properties from defendant to plaintiff.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.

All concur except WESTHUES, J., not sitting.