Raymond A. DAVIS, Appellant,

v.

Viola Mae Davis BROUGHTON, Respondent.

No. 8182.

Springfield Court of Appeals.

Missouri.

July 20, 1963.

# 858

J. W. Grossenheider, Lebanon, for appellant.

Neale, Newman, Bradshaw, Freeman & Neale, Paul L. Bradshaw, Springfield, for respondent.

STONE, Judge.

On August 3, 1961, Raymond A. Davis, as plaintiff, instituted an action (hereinafter referred to as Case No. 6095) in the Circuit Court of Pulaski County, Missouri, against his former wife, Viola Mae Davis Broughton, as defendant, by the filing of his petition in which he alleged that (for reasons hereinafter detailed) he was "entitled to a 50% undivided interest" in certain described real estate in St. Robert, Missouri, (hereinafter referred to as the tract), of which Viola Mae was the record owner. The prayer of Raymond's petition was for an "order" (a) "granting to him an equitable lien setting forth his interest in (the tract) as a 50% undivided interest," (b) directing Viola Mae to pay the balance of the note secured by deed of trust on the tract, and (c) foreclosing Raymond's equitable lien. In due time, Viola Mae filed in Case No. 6095 (a) an answer denying Raymond's right to any such order or relief and (b) a counterclaim for $697.80, as one-half of the balance on April 4, 1960 (when Raymond had sued Viola Mae for divorce) in a joint bank account maintained by the parties in the Waynesville Security Bank of Waynesville, Missouri (hereinafter referred to as the bank).

On September 14, 1961, Viola Mae, as plaintiff, countered with an action of ejectment (hereinafter referred to as Case No. 6148) against Raymond, as defendant. V. A.M.R. Rule 89; V.A.M.S. Chapter 524. In her petition, Viola Mae alleged her ownership of the tract, averred that on or about March 26, 1960, she had entered into "an oral lease agreement" with Raymond whereby he had obligated himself to pay "$20 per week for rent" of the dwelling house on the tract, and asserted that he had paid only $525 under the lease agreement and then owed "$950 for unpaid rent." The prayer was for possession of the dwelling house and for the unpaid rent. Having been consolidated and thereafter transferred, by agreement of counsel, to the Circuit Court of Phelps County, Cases Nos. 6095 and 6148 were tried on March 8, 1962, and taken under advisement.

On July 31, 1962, judgment was rendered (a) in Case No. 6095 finding that the evidence was insufficient to establish plaintiff Raymond's claim to an equitable lien and therefore dismissing his petition, (b) in Case No. 6095 finding the issues for plaintiff Raymond and against defendant Viola Mae on her counterclaim, (c) in Case No. 6148 finding that plaintiff Viola Mae was entitled to possession of the tract and directing restitution of possession to her, (d) in Case No. 6148 finding that there was "insufficient evidence to support a lease or rental agreement between the parties as to the dwelling house" on the tract and "no evidence as to the fair rental value thereof" and therefore denying plaintiff Viola Mae's claim for rent, (e) in Case No. 6148 finding that plaintiff Viola Mae nevertheless was "entitled to recover nominal damages" from defendant Raymond for his occupancy of the dwelling house, "which damages the court (fixed) at the sum of $25 per month from and after September 14, 1961, the date plaintiff filed her petition for possession," and (f) taxing two-thirds of the costs in the consolidated cases against Raymond and one-third thereof against Viola Mae. Raymond has perfected this appeal from the adverse rulings detailed in (a), (c) and (e), supra. Since Viola Mae has not appealed,

the rulings detailed in (b) and (d), supra, stand unassailed and accepted. Lewis v. Lewis, 354 Mo. 415, 189 S.W.2d 557, 559(1); Wilson v. Motors Ins. Corp., Mo.App., 349 S.W.2d 250, 251.

■ Raymond and Viola Mae first married on December 17, 1938, when he was twenty-one and she was seventeen. Raymond farmed and was employed in construction work until he went into the Marine Corps during World War II. After his discharge from service in December 1945, he became a barber. On June 29, 1953, while Raymond thus was employed at Fort Leonard Wood, he and Viola Mae purchased the tract in the nearby community of St. Robert for $1,500 and took title thereto in their joint names. On June 30, 1954, Viola Mae was granted a decree of divorce, alimony of $30 per week, and child support of $60 per week for the two children born of the marriage. Of course, the legal effect of the decree was to dissolve the tenancy by the entirety in the tract, so that thereafter the parties were tenants in common, each owning an undivided one-half interest in the tract. Hahn v. Hahn, Mo., 297 S.W.2d 559, 566(10); Brinker v. Brinker, 360 Mo. 212, 227 S.W.2d 724, 726(2); Hiatt v. Hiatt, Mo., 168 S.W.2d 1087, 1089(6).

■ More than three months after the divorce, to wit, on October 8, 1954, Raymond by warranty deed conveyed his interest in the tract to Viola Mae. She testified, without objection or contradiction, that this was done "as a part of the property settlement of that first divorce"; but, whatever may have motivated the conveyance, there has been and is no attack upon its integrity. Granting to such conveyance, as in these circumstances we should, the full effect affixed to it by law [Pfeiffer v. Pfeiffer, Mo., 355 S.W.2d 934, 939(2); Ferguson v. Stokes, Mo., 269 S.W.2d 655, 660], Viola Mae thereby became sole owner of the tract. There was no change in the record title of the tract at any time thereafter.

"A month or so" prior to December 17, 1955 (the anniversary of their first marriage), Raymond and Viola Mae agreed to remarry on that anniversary date; and about the same time they decided to enlarge the dwelling house on the tract and, for that purpose, borrowed $3,500 from the bank on December 2, 1955, with the indebtedness evidenced by a note signed by both and secured by a deed of trust on the tract executed by Viola Mae only. The parties thereafter remarried on the appointed date and during their subsequent married life resided, with the children born of their first marriage, in the dwelling house on the tract. Primarily to purchase furniture, an additional sum was borrowed from the bank on July 28, 1956. This and all other bank loans obtained during the period of the second marriage were evidenced by notes signed by both spouses and were secured by deeds of trust on the tract likewise executed by both.

On June 26, 1957, a small portion of the tract was sold for $2,250 and the proceeds of this sale, with $219.60 added thereto, paid the then balance of the bank loan. The remaining major portion of the tract (to which we continue to refer simply as the tract) thereafter was unencumbered until March 10, 1958, when the parties borrowed $6,857.69 from the bank for the purpose of erecting on the tract a building in which to operate a shoe store. To stock the store, additional funds were borrowed on April 18, 1958, increasing the bank loan to $11,735.20. A fire on December 12, 1959, "entirely destroyed the stock * * * and partially ruined the building." From $16,000 received under a fire insurance policy issued to and in the name of Viola Mae alone, as the sole owner of the insured property, the then balance of the bank loan, to wit, the sum of $6,101.12, was paid on January 21, 1960, so the tract again became unencumbered and thereafter remained clear until the second marital venture of the parties was terminated by decree of divorce granted to Raymond on April 16, 1960. Some two months later, to wit, on June 22,

*1960,* Viola Mae borrowed $5,754.16 from the bank to repair the building and to re-open the shoe store; and, on *April 7, 1961,* she increased her bank loan to $9,763.20, of which $8,136.00 remained unpaid when the case was tried on March 8, 1962. These loans subsequent to the second divorce were evidenced by notes signed only by Viola Mae and were secured by deeds of trust on the tract likewise executed only by her.

Raymond pleaded two reasons why (in his view of the matter) he was entitled to an undivided one-half interest in the tract and to an equitable lien therefor, namely, (1) because (so he averred) *he* had repaid the bank loans, the proceeds of which had been used to enlarge the dwelling house and to erect the building on the tract, and (2) because of an alleged agreement between himself and Viola Mae shortly prior to the second divorce on April 16, 1960.

*Of Raymond's claim of repayment of bank loans.* When Raymond and Viola Mae remarried on December 17, 1955, she had in her individual name a checking ac-count in the bank with a then balance of $2,689.54; but, although Raymond had an-nual earnings (so he said) of $10,000 to $12,000 per year, he had no bank account. On March 13, 1956, by which date the balance in her checking account had been reduced to $438.25, Viola Mae converted that account into a statutory joint account in the names of herself and Raymond (hereinafter referred to as the joint ac-count). See V.A.M.S. Sec. 362.470. There-after, both parties made deposits in the joint account, and all payments on the bank loans were made from that account.

During the period of the second marriage (i. e., from December 17, 1955, to April 16, 1960), *Viola Mae received monies from several sources in a substantial aggregate sum, all of which was, so she testified with-out contradiction, deposited in the joint ac-count,* to wit, (a) from sale of a small por-tion of the tract on June 26, 1957, the sum of $2,250 which admittedly was paid on the then outstanding bank loan, (b) from rental

of a cabin on the tract, $45 per month during the first year of the second marriage and $40 per month thereafter, or approximately $2,140 in the aggregate, and (c) from part-time employment by "the liquor association in St. Robert" for "a little over a year," $50 to $60 per month or not less than $600 in the aggregate. Thus, in addition to the $438.25 in her individual bank account when it was converted into the joint account, Viola Mae's subsequent deposits from the foregoing sources totaled almost $5,000, considerably more than the $3,500 borrowed from the bank on *December 2, 1955,* to enlarge the dwelling house on the tract. The parties agreed that the additional sum borrowed on *July 28, 1956,* was used pri-marily for the purchase of *jointly-owned* furniture, all of which *Raymond* kept after the second divorce.

The bank loans of *March 10, 1958,* and *April 18, 1958,* were used to erect the store building and to stock the shoe store. Although Raymond said that he had "helped" in the shoe store "of a morning" before he commenced his nine-hour work-day as a barber and that "we worked to-gether on it (the store)," he readily con-ceded that Viola Mae had opened the store and that "she was the one that took care of the business"—"she had the biggest charge of it." From the record as a whole, it is clear that Viola Mae was indeed the moving and guiding force in the business and that Raymond had little knowledge of it. He had no idea what the gross income or the net profit was, but he quickly agreed that "whatever the store made" was in the joint account. Viola Mae testified posi-tively that the net operating profit of the shoe store was "$600 the first month" and thereafter "never smaller than that"; that all receipts from the store were deposited in the joint account; and that all maturing monthly installments on the bank loans were paid from the joint account. As we have hereinbefore noted, the then unpaid bal-ance of the bank loan, to wit, the sum of $6,101.12, was paid in full on *January*

*21, 1960,* out of $16,000 paid under a fire insurance policy issued to and in the name of Viola Mae alone, as sole owner of the insured property. From the transcript presented, it is impossible to determine either the frequency or the amount of *Raymond's* deposits in the joint account prior to January 21, 1960, our knowledge on this subject being limited by and to his curt, laconic, meaningless statement, "I deposited there, yes"; and thus it likewise is impossible to ascertain what, if any, portion of the bank loans was paid by or from funds deposited by Raymond. Without further recitation of record minutiae, the foregoing will suffice to demonstrate that Raymond utterly failed upon trial to establish or support *factually* his pleaded theory that he was entitled to an undivided one-half interest in the tract and to an equitable lien therefor because *he* had repaid the bank loans.

*Of Raymond's claim of an alleged agreement with Viola Mae.* Actually, Raymond said that there were *two* agreements, both within the month prior to the second divorce on April 16, 1960. The *first* was an alleged *oral* agreement reached "whenever we agreed to a divorce," under the terms of which, as related by Raymond, (a) he and the two children (the older of whom, a teen-age daughter, was then a pregnant divorcee) were to occupy the dwelling house on the tract until it could be sold "at a reasonable price," (b) the proceeds of sale of the tract then were to be divided equally, and (c) Raymond was to keep all of the jointly-owned furniture and to have the entire balance in the joint account. *Viola Mae's* statement of the *oral* agreement was decidedly different, to wit, (a) Raymond and the children were to occupy the dwelling house until the pregnant daughter delivered in June 1960 and "they could find suitable quarters" thereafter, (b) the parties were to "peaceably divide" the jointly-owned furniture or sell it and divide the proceeds, and (c) the joint bank account was to be divided after the birth of the grandchild, with the money kept "there and ready" in

the meantime "because the doctor had said it would be Caesarean and there might be complications." According to Viola Mae, Raymond then claimed no interest in the tract and the *oral* agreement did not purport to deal with its sale.

The *second* agreement was *in writing.* Viola Mae having said that "she didn't care to be there" when the second divorce was granted, Raymond's attorney (in an adjoining county) prepared a petition for signature by Raymond and an entry of appearance and answer for signature by Viola Mae and, pursuant to appointment, met and talked with both of them on April 4, 1960, in a parked automobile in Waynesville. Raymond testified that his attorney "recommended she get an attorney and they could get together and work out an agreement between us" but "she didn't think that was necessary," so his attorney "prepared one *hisself*" which both parties then read and signed. This agreement, five handwritten lines in length on a sheet of yellow tablet paper, was (quoted in its entirety, excepting signatures): "1. Mrs. Davis wants Michael through holidays & summer vacations—*agreeded* by both parties. 2. Mr. Davis & Mrs. Davis agreed to have Mrs. Davis receive $20 per week until their property is sold and the proceeds divided."

Upon trial, both parties treated the *written* agreement as within the scope of the general principle that "if a written contract appears on its face to be incomplete or ambiguous, extrinsic evidence, either written or oral, is admissible to resolve such ambiguity in order to determine the true intention of the parties." Fisher v. Miceli, Mo., 291 S.W.2d 845, 848(5). So, *Raymond* testified in substance that *"their property"* contemplated and included the tract, while *Viola Mae* testified in substance that, since on the date of execution of the written agreement she and Raymond had owned jointly only the furniture and the joint account, her understanding of the written agreement had been that *"their property"* reasonably could have referred, and actually

did refer, only to the furniture and the joint account and that the tract was not "included in this (written) agreement at all." *The draftsman of the written agreement did not testify.*

■ With no specific findings of fact requested or made, such factual issues as were raised by the conflicting and contradictory testimony of the parties with respect to the *oral* agreement and the *written* agreement were ruled against plaintiff Raymond by the general finding that the evidence was insufficient to establish his claim in Case No. 6095. V.A.M.R. Rule 73.01(b); V.A.M.S. Sec. 510.310(2); Rauth v. Dennison, Mo.App., 357 S.W.2d 201, 206(4). And, with determination of those issues depending so largely upon the credibility of the parties and the weight and value accorded to their testimony, we would be inclined to defer to the finding of the trial judge, if positive resolution of the conflicts and contradictions were essential to proper disposition of this appeal. However, in our view of the matter, that becomes unnecessary under the controlling legal principles to which we now turn.

■ Where a husband purchases realty with his own funds but causes title to be conveyed to his wife, the law presumes that the husband intended such conveyance to be a gift to or a provision for his wife.[1] This presumption is a rebuttable one;[2] but, to overcome it, the evidence to the contrary must be so clear, cogent and convincing as to leave no reasonable room for doubt in the mind of the trial chancellor.[3] And, in any such situation, the essential and meritorious inquiry is as to the intention of the husband *at the time of payment.*[4] As logically should be true, the same presumption obtains, and the same general principles are applicable, with respect to payments by the husband either upon a loan secured by deed of trust covering his wife's realty or for improvements upon her realty.[5]

At all times from and after October 8, 1954 (more than fourteen months prior to his remarriage to Viola Mae) when he had conveyed his interest in the tract to her, Raymond admittedly knew that record title to the tract was in her alone, and he was charged with constructive knowledge *(and did not deny actual knowledge)* of the *legal effect* of his conveyance of October 8, 1954, and of the state of the record title. Holman v. Holman, Mo., 183 S.W. 623, 625. Nevertheless (in his language), "it was perfectly all right to leave it (the title) that way." Compare Cisel v. Cisel, 352 Mo. 1097, 1101–1102, 180 S.W.2d 748, 750(2). Thus, the tract was the sole and separate property of Viola Mae when she and Raymond remar-

1. Hampton v. Niehaus, Mo., 329 S.W.2d 794, 799(2); Gillespie v. Gillespie, Mo., 289 S.W. 579, 581(3); Woodward v. Woodward, 148 Mo. 241, 246, 49 S.W. 1001, 1002; Ilgenfritz v. Ilgenfritz, 116 Mo. 429, 435, 22 S.W. 786, 787(1); Schuster v. Schuster, 93 Mo. 438, 444, 6 S.W. 259, 261.

2. Hiatt v. Hiatt, Mo., 168 S.W.2d 1087, 1090(9); Bender v. Bender, 281 Mo. 473, 477, 220 S.W. 929, 930(4); Viers v. Viers, 175 Mo. 444, 453, 75 S.W. 395, 398; Alexander v. Alexander, Mo.App., 44 S.W.2d 872, 874(2).

3. Gillespie, supra, 289 S.W. loc. cit. 581(4); Viers, supra, 175 Mo. loc. cit. 453, 75 S.W. loc. cit. 398(2); Curd v. Brown, 148 Mo. 82, 92, 49 S.W. 990, 992; Alexander, supra, 44 S.W.2d loc. cit. 874(4).

4. Dallmeyer v. Dallmeyer, Mo., 274 S.W.2d 250, 255; Hampton, supra, 329 S.W.2d loc. cit. 799(4); Wenzelburger v. Wenzelburger, Mo.App., 296 S.W.2d 163, 166(8); 2 Restatement of Trusts 2d, § 443, comment a, loc. cit. 404.

5. Woerheide v. Kelley, Mo., 243 S.W. 158, 163(7); Pursley v. Pursley, Mo.App., 215 S.W.2d 302, 306–307(4, 5); In re Polizoe's Estate, Mo.App., 229 S.W.2d 293, 297–298(2–4). See also Hampton, supra, 329 S.W.2d loc. cit. 803(13); Dallmeyer, supra, 274 S.W.2d loc. cit. 255–256(9); Schowe v. Kallmeyer, 323 Mo. 899, 911–912, 20 S.W.2d 26, 30–31(12); Holman v. Holman, Mo., 183 S.W. 623, 625; Woodward, supra, 148 Mo. loc. cit. 246, 49 S.W. loc. cit. 1002(2); Curd, supra, 148 Mo. loc. cit. 95, 49 S.W. loc. cit. 993(6).

ried, and there was no subsequent change in its status. V.A.M.S. Sec. 451.250(1).

Under the controlling principles hereinbefore stated, the burden rested upon Raymond to show by clear and positive evidence [Woerheide v. Kelley, Mo., 243 S.W. 158, 163(7); In re Polizoe's Estate, Mo.App., 229 S.W.2d 293, 297(2), 298(4)] that, when the several bank loans were paid, it *then* was his intention that whatever portion of such payments he contributed (by way of his deposits in the joint account) was *not* to be a gift to or provision for his wife. Dallmeyer v. Dallmeyer, Mo., 274 S.W.2d 250, 255. But the record before us would neither justify nor permit a finding that, at the time of any deposit by Raymond in the joint account or any payment therefrom on the bank loans, Raymond *then* intended to claim any right of reimbursement, any interest in the tract, or any lien thereon. Contrast Prasse v. Prasse, Mo., 77 S.W.2d 1001 (the only husband-and-wife case cited by Raymond's counsel), where defendant wife conceded that "(w)hen the time came for this financing (of improvements on the wife's lot), the plaintiff wanted to be protected by having his name in the title deed" and that, although the wife had refused to do that, she had "said she would protect him." 77 S.W.2d loc. cit. 1003.

In the case at bar, it was the latter part of March 1960 *(after all of the notes to the bank, on which Raymond had been a comaker, had been paid in full,* and less than one month before the second divorce on April 16, 1960) when he told Viola Mae he "needed a divorce" and *then* reached the *oral* agreement with her (so he said) that the tract would be sold and the proceeds would be divided equally between them. Even at that late date, Raymond did not complain of the state of the title and, under his own version of the oral agreement, would not have been entitled to an equitable lien on the realty. Welborn v. Rigdon, Mo., 231 S.W.2d 127, 133–134(12).

With appropriate respect for the statutory direction that we should accord due regard to the opportunity of the trial court to judge of the credibility of the witnesses and that the judgment nisi should not be set aside unless it is clearly erroneous [V.A.M.R. Rule 73.01(d); V.A.M.S. Sec. 510.310(4); Beckemeier v. Baessler, Mo., 270 S.W.2d 782, 783(1)], it becomes our plain duty to affirm the judgment in Case No. 6095 dismissing plaintiff Raymond's petition for the insufficiency of the evidence to establish his claim to an equitable lien.

However, Raymond asserts that, regardless of whether he is entitled to an equitable lien on the tract, the judgment in Case No. 6148 was erroneous. In his assignment of error with respect to that portion of the judgment directing restitution of possession to Viola Mae, Raymond relies upon the principle that the right to *immediate* possession is a prerequisite to recovery in ejectment. V.A.M.R. Rule 89.06; V.A.M.S. Secs. 524.010 and 524.080; Hrovat v. Bingham, Mo.App., 341 S.W.2d 365, 371(11); Towers v. Lusby, Mo.App., 175 S.W.2d 921, 922(1). True, Raymond testified (as we have noted) that, under the alleged *oral* agreement during the latter part of March 1960, he and the two children were to occupy the dwelling house on the tract until it could be sold "at a reasonable price." But, when Viola Mae asked Raymond on July 17, 1961 (the day before she married her present husband) to vacate the dwelling house, he admittedly told her that he would do so and immediately began to look for another house; and it was after he subsequently had learned of Viola Mae's marriage to her present husband and had consulted with an attorney that Raymond changed his mind and refused to vacate the dwelling house. Furthermore, Viola Mae testified in substance (as hereinbefore recorded) that Raymond and the children were to occupy the dwelling house only until the pregnant daughter delivered in June 1960 and "they could find suitable quarters" thereafter.

■ Again, positive resolution of the conflicts and contradictions in the testimony

is unnecessary to determination of the complaint under consideration. For, since Raymond did not occupy the dwelling house under a written agreement, his tenancy was terminable upon one month's notice in writing. V.A.M.S. Sec. 441.060. And such notice (in no wise challenged as to form, substance or timeliness) was served upon Raymond personally on August 7, 1961, thirty-eight days prior to institution of Viola Mae's action of ejectment on September 14, 1961. Accordingly, Viola Mae had the right to immediate possession of the dwelling house when she sued therefor, and that portion of the judgment in Case No. 6148 directing restitution of possession to her was proper and should be affirmed.

This brings us to Raymond's final point that the trial court erred in Case No. 6148 in adjudging that Viola Mae was "entitled to recover nominal damages" from Raymond "for his occupancy" of the dwelling house, "which damages" the court fixed at $25 per month from and after September 14, 1961, the date of filing of the action of ejectment. Notwithstanding that the court found (and, we think, properly so) in Case No. 6148 that there was "insufficient evidence to support a lease or rental agreement between the parties as to the dwelling house" and "no evidence as to the fair rental value thereof," the judgment for "nominal damages" of $25 per month obviously was a periodic allowance in lieu of rent; and, by entry of that judgment on July 31, 1962, liability was imposed upon Raymond for "nominal damages" theretofore accrued in the aggregate sum of $250 as well as such damages accruing thereafter so long as he retained possession of the dwelling house.

■ Although Viola Mae's counsel point to a statement that the term "nominal damages" carries no suggestion of certainty as to amount [25 C.J.S.Damages § 16, p. 471], it is abundantly clear that this term means a trivial or trifling amount.[6] "Nominal damages" are damages in name only [7]—"a mere peg to hang costs on"; [8] and the reported cases in this [9] and other [10] jurisdictions are flecked with references to awards of one dollar or less as judgments for nominal damages.

■ In Hahn v. Cotton, 136 Mo. 216, 37 S.W. 919, an action of ejectment in which

6. Seelig v. Missouri, K. & T. Ry. Co., 287 Mo. 343, 363, 230 S.W. 94, 102(4); Baden v. Sunset Fuel Co., 225 Or. 116, 357 P.2d 410, 411(2); Stoll Oil Refining Co. v. Pierce, Ky., 343 S.W.2d 810, 811(1); Gould v. Mountain States Tel. & Tel. Co., 6 Utah 2d 187, 309 P.2d 802, 803(2); Chesapeake & Potomac Tel. Co. v. Clay, 90 U.S.App.D.C. 206, 194 F.2d 888, 890(1); 4 Restatement, Torts, § 907, p. 551; 25 C.J.S. Damages § 16, p. 471; 28A Words and Phrases (Perm. Ed.), "Nominal Damages", p. 303.

7. Walters v. Geheran, Sup., 192 N.Y.S.2d 23, 24(2); Thompson v. Anderson, 107 Utah 331, 153 P.2d 665, 667(7); Lucas v. Morrison, Tex.Civ.App., 286 S.W.2d 190, 191(5); 15 Am.Jur., Damages, § 5, loc. cit. 392.

8. Stanton v. New York & E. Ry. Co., 59 Conn. 272, 22 A. 300, 303; Stoll, supra, 343 S.W.2d loc. cit. 811; Ferreira v. Honolulu Star-Bulletin, Ltd., 44 Haw. 567, 356 P.2d 651, 658. See Curd v. Reaban, Mo., 232 S.W.2d 389, 392(5).

9. Davidson v. Schneider, Mo., 349 S.W.2d 908, 913; Hecker v. Bleish, 319 Mo. 149, 178, 3 S.W.2d 1008, 1021; Seelig, supra, 287 Mo. loc. cit. 363, 230 S.W. loc. cit. 102; Hahn v. Cotton, 136 Mo. 216, 224, 226, 37 S.W. 919, 920, 921; Bourne v. Pratt & Whitney Aircraft Corp., Mo.App., 207 S.W.2d 533, 542(11); Del Commune v. Bussen, Mo.App., 179 S.W.2d 744, 748 (5).

10. Moyer v. Cordell, 204 Okl. 255, 228 P. 2d 645, 648(3); Price v. McComish, 22 Cal.App.2d 92, 70 P.2d 978, 982; Broads v. Mead, 159 Cal. 765, 116 P. 46, 47; Lucas, supra, 286 S.W.2d loc. cit. 191–192(5); Gould, supra, 309 P.2d loc. cit. 803(2); Ferreira, supra, 356 P.2d loc. cit. 658; Ferguson v. Hoshi, 25 Wash. 664, 66 P. 105, 106; Hasselbusch v. Mohmking, 76 N.J.L. 691, 73 A. 961, 962; Walters, supra, 192 N.Y.S.2d loc. cit. 24(3); Heath v. United States, D.C.Ala., 85 F.Supp. 196, 203; 15 Am.Jur., Damages, § 5, loc. cit. 392.

the trial court had "found for plaintiff for possession, with one cent damages, and further found the monthly value of the rents and profits to be three dollars" [136 Mo. loc.cit. 224, 37 S.W. loc.cit. 920], our Supreme Court said that, "without other proof than of the unlawful retention of the possession. * * * the finding for one cent damages was proper" but that, *"(w)ithout testimony as to value* (of the rents and profits), *there certainly could not properly be a finding for monthly rent at the rate of three dollars per month. That finding could not be regarded as nominal."* 136 Mo. loc.cit. 226, 37 S.W. loc.cit. 921. (Emphasis ours) Even in this day of easy money and continuing inflation, we are unable to accept and approve the theory that an award of $25 per month properly may be made under the guise of "nominal damages." [11]

The judgment of the circuit court in Case No. 6095 is affirmed; the judgment of the circuit court in Case No. 6148 is set aside and that cause is remanded with directions to re-enter, as of July 31, 1962, the judgment for plaintiff, Viola Mae Davis Broughton, for restitution of possession of the tract to her, and to enter, as of the same date, judgment in favor of plaintiff and against defendant for nominal damages in the sum of $1.00; the judgment of the circuit court as to the taxing of costs in the consolidated cases is affirmed; and the costs on this appeal are taxed against the parties, share and share alike, i. e., one-half against Raymond A. Davis and one-half against Viola Mae Davis Broughton.

RUARK, P. J., and HOGAN, J., concur.

11. Many awards of "nominal damages" in amounts less than the $250 which had accrued prior to entry of the judgment here under review have been disapproved. E. g., *awards for $75:* Gould, supra, 309 P.2d loc. cit. 803(1)—*for $100:* Baden, supra, 357 P.2d loc. cit. 411(2); Broads, supra, 116 P. loc. cit. 47(8); Chowchilla Nat. Bank v. Nilmeier, 83 Cal.App. 18, 256 P. 298, 299(6); Lucas, supra, 286 S.W.2d loc. cit. 191–192(6)—*for $105:* Moyer, supra, 228 P.2d loc. cit. 648(3)—*for $200:* Hinson v. A. T. Sistare Const.

Co., 236 S.C. 125, 113 S.E.2d 341, 345 (11); Mahoney v. Bentman, 110 Conn. 184, 147 A. 762, 768(18), 66 A.L.R. 1121, 1130(17); Price, supra, 70 P.2d loc. cit. 982(4); Thompson, supra, 153 P.2d loc. cit. 667–668. See generally 15 Am.Jur., Damages, § 5, loc. cit. 392; Lacey v. Laird, 166 Ohio St. 12, 139 N.E.2d 25, 31; Chesapeake & Potomac Tel. Co., supra, 194 F.2d loc. cit. 890(5). Consult also Hecker, supra, 319 Mo. loc. cit. 176, 178, 3 S.W.2d loc. cit. 1020, 1021; Conley v. Dee, Mo.App., 246 S.W.2d 385, 387