Gloria H. (Mauk) WOODWORTH, Respondent,

v.

James M. MAUK, Jr., et al., Appellants.

No. WD 31481.

Missouri Court of Appeals, Western District.

March 30, 1981.

Guy A. Magruder, Jr., Kansas City, for appellants.

James S. Cottingham, Independence, for respondent.

Before KENNEDY, P. J., and SHAN-GLER and SOMERVILLE, JJ.

KENNEDY, Presiding Judge.

This is a partition suit in which Gloria Woodworth, formerly Gloria Mauk, seeks partition of a house located at 5425 Harvard, Raytown, Missouri. She claims a one-half interest therein by virtue of a warranty deed naming her as a joint tenant along with James Mauk, her former husband, and Gladys Mauk, James's mother, now deceased. Appellants James Mauk and Joanne Mauk Randall, children and heirs of the deceased Gladys Mauk, claim that Gloria's record title was held by her in a resulting trust for Gladys and that Gloria is beneficially entitled to no interest in the property.

In the alternative James asks, should Gloria be adjudged to be the beneficial owner of an interest in the real estate, that he have judgment against Gloria for reimbursement or contribution for monies paid by him upon a certain lien on the property.

The trial court held that Gloria was entitled to an undivided one-half interest in the property, and turned down defendant's claim that she held the same in a resulting trust. The trial court also denied James's claim against Gloria for contribution or reimbursement.

We hold that Gloria was entitled to a one-fourth interest in the property instead of one-half, and otherwise we affirm the judgment of the trial court.

Gladys Mauk died March 16, 1977. She resided in a house at 5425 Harvard in Raytown, Missouri. The title to that property was represented by a warranty deed executed in 1963. The warranty deed is on a familiar printed form in which the granting clause names and describes the grantees as follows: "James M. Mauk, Jr. and Gloria H. Mauk, husband and wife, and Gladys B. Mauk, a single woman, as joint tenants and not as tenants in common." Following the description of the real estate, there was typed into the deed this language: "The intention of the grantor herein is to convey to James M. Mauk, Jr. and Gloria H. Mauk, husband and wife, an undivided one-half (½) interest and to Gladys B. Mauk, a single woman, an undivided one-half (½) interest."

■ Laying aside appellants' claim that Gloria's interest—and, as it necessarily follows, James's own interest—was held in a resulting trust for Gladys, we interpret the deed as follows: The deed gave James and Gloria an undivided one-half interest as tenants by the entirety. Its description of them as husband and wife *prima facie* had that effect, *Nelson v. Hotchkiss*, 601 S.W.2d 14, 19[4] (Mo. banc 1980); § 442.450, RSMo 1978, and the typed-in statement following the description, which allocated to them a one-half interest and which again described their relationship as husband and wife, emphasizes the point. In describing the grantees as joint tenants in the granting clause, it meant that as between Gladys B. Mauk on the one hand and James and Gloria on the other, there was a joint tenancy. Had James and Gloria remained husband and wife, they would have succeeded to Gladys's interest by right of survivorship upon her death in 1977.

■ James and Gloria did not remain married, though; they were divorced February 19, 1973, and remarried and divorced again in 1975. Gladys was still living at the time of both divorces, of course. No mention or disposition of the Harvard Street property was made in either divorce. The effect of the first divorce was to convert James's and Gloria's tenancy by the entirety in an undivided one-half interest to a tenancy in common, each owning an undivided one-fourth interest therein. *Nelson v. Hotchkiss, supra* at 21[12]; *Davis v. Broughton*, 369 S.W.2d 857 (Mo.App.1963). Neither their remarriage in 1975, nor their second divorce in the same year, had any legal effect upon the title.

The 1973 divorce had the further effect of destroying the joint tenancy between Gladys and the couple, and each of them, because it destroyed the unity of interest. So holds *Nelson v. Hotchkiss, supra* at 21, decided after the trial court's judgment in the present case. After the 1973 divorce, therefore, Gladys owned an undivided one-half interest and James and Gloria each owned an undivided one-fourth interest as

tenants in common. Gladys's one-half interest on her death in 1977 passed to her heirs, James and Joanne, by intestate descent. Thus the legal title stood at the commencement of the partition suit now under review.

James and Joanne claim, however, that Gloria's legal title under the warranty deed was held by her as trustee under a resulting trust. If their contention prevails, Gloria would have no beneficial interest in the real estate.

A resulting trust "results" when legal title to property is placed in one and the purchase price is furnished by another, and it would be inequitable to allow the legal titleholder to claim the beneficial interest. The legal titleholder is said to hold the same in a resulting trust for the one who provided the purchase money. Equity will execute the trust. *Decker v. Fittge*, 365 Mo. 139, 276 S.W.2d 144 (1955); *Carr v. Carroll*, 178 S.W.2d 435 (Mo.1944). The establishment of a resulting trust, since it derogates an arrangement which the parties have solemnly memorialized in black and white, must be proved by clear, cogent, convincing proof, such as to leave no doubt in the mind of the chancellor. *Decker v. Fittge, supra* at 147; *Adams v. Adams*, 348 Mo. 1041, 156 S.W.2d 610, 614 (1941).

The trial court rejected James's and Joanne's claim of resulting trust. We review by the standards of *Murphy v. Carron*, 536 S.W.2d 30 (Mo.1976), and affirm the judgment of the trial court on this feature of the case.

The evidence shows that Gladys wanted to purchase the Harvard Street property in 1963 as a residence for herself. She was in her fifties or sixties and widowed since 1958. She contracted to purchase the house for $13,000. She paid $2,600 cash. The balance was represented by a purchase money note and deed of trust to First Federal Savings & Loan Association in the sum of $10,400. According to James's testimony, First Federal would not make a loan to Gladys alone, because of her age and her small income. They required as a condition to making the loan that James and Gloria sign the note and deed of trust and that they "be on" the warranty deed. The deed was made in the form earlier described. The note and deed of trust were signed by Gladys and by James and Gloria. It was payable at the rate of $66 per month, including a 5¾% annual interest. The loan application shows the payments to be $88 per month, including taxes of $16 and insurance premium of $6.

Contemporaneously with the transaction described in the preceding paragraph, James and Gloria signed a note to Gladys for $6,336 repayable in monthly payments of $88 each. This was for money lent by Gladys to James and Gloria to assist them in building a house. This note bore no interest. James and Gloria were to make the payments to First Federal on the Harvard Street note, and would in turn receive credit upon their $6,336 note to Gladys. Only one payment—the first one—was recorded as a credit on the $6,336 note.

From the beginning up to the time of trial James had made all, or nearly all, the payments on the First Federal note. Gloria's testimony was that James and she had made the payments, but the payments were made from James's earnings and she did not have any separate funds from which to pay them. James said that some of the payments were made by Gladys. He said that sometimes "she would reimburse me if she had any extra money" in the form of "personal check. Gift. Usually cash gift. Little whatevers. She might give some to Gloria one time and some to me the next ... off and on as a gift". At another point he seems to say that she made the payments "most of the time ... until somewhere in the '60's, upper '60's, somewhere in there". At that time "we" started deducting on his income tax return the interest and taxes paid. After the first divorce, in 1973 and 1974, Gladys reimbursed James for some unspecified number of the monthly payments made on the First Federal note. At trial time—August 20, 1979—the balance on the First Federal note had been reduced to about $5,000.

The house was not mentioned in either the 1973 or the 1975 divorce. Both parties considered the house as Gladys's.

The contention of appellants is that all of the purchase price of the Harvard Street property is traceable to Gladys's funds, and whatever legal interest Gloria had in the property was held in a resulting trust. It is to be noted that they do not undertake to show an apportionment of the purchase price, as was the case in *Decker v. Fittge, supra* at 147, where both the titleholder and another had contributed to the purchase price and the titleholder was found to hold as trustee *pro tanto* for such other. Had they undertaken to show the respective contributions of Gladys, James and Gloria, the evidence would very likely be too vague for that kind of resulting trust. The cases require a certain exactitude to prove a *pro tanto* resulting trust. See *Shelby v. Shelby*, 357 Mo. 557, 209 S.W.2d 896 (1948); Bogert, Trusts & Trustees, § 457 (1977); 5 Scott on Trusts, § 454.5 (1967).

Did Gladys furnish all the purchase price? She did not. She did furnish the initial $2,600. James and Gloria pledged their personal credit and became personally obligated on the $10,400 First Federal note. But James and Gloria not only pledged their personal credit by signing the note, they paid the payments thereon, or most of them. Appellants claim that the First Federal payments were made by James in repayment of their $6,336 note, and not as any contribution to the purchase price of the house. The $6,336 note, however, bearing no interest, would have been paid off at the rate of $88 per month in July, 1969. But James continued (except as noted) to make the payments down to the time of trial, approximately 10 years longer. At $88 per month this would have totaled an additional $10,560 paid by James after the $6,336 note was paid in full. As to the $5,000 remaining to be paid on the First Federal note, Gloria remains personally liable on that and will pay her share from the proceeds of the sale.

James testified that Gladys in 1963 was able to pay cash for the Harvard Street property, and wanted to do so, but that she negotiated the First Federal loan in order to "free up" her own funds to lend to James and Gloria to assist them in building a house. Why she borrowed $10,400 to free up $6,336 the record nowhere explains. Had she instead used the $6,336 on the Harvard Street property, she still would have needed to come up with $4,074, by loan or from some other source. No attempt is made to explain the odd figure of $6,336.

The appellants emphasize that the house was ignored in the two divorces between James and Gloria, for the reason that they both, and all the family, considered the house as Gladys's. That fact is not decisive. The evidence shows that neither James nor Gloria was given to a close analytical view of business matters. The evidence was equivocal. If it was consistent with appellants' theory of the case, it was just as consistent with a loose family arrangement by which Gladys would be provided a home throughout her life, to which James and Gloria would make a substantial contribution and in which they would have a beneficial interest to be realized upon only upon Gladys's death. Neither of them would wish to disturb Gladys in her peaceful possession of the Harvard Street property.

The foregoing recital of the evidence will show that the evidence fell far short of that satisfying unequivocal character which would free the chancellor's mind of doubt.

■ Then James says he is entitled to contribution from Gloria for payments made on the $10,400 note to First Federal. James points out that he, not Gloria, has made all of such payments. We said earlier that from the time of the purchase of the property in 1963 until Gladys's death in 1977, except for 44 months, James and Gloria were married to each other. James is presumed to have been making the payments on his and Gloria's account, *Hahn v. Hahn*, 297 S.W.2d 559, 566–7 (Mo. banc 1957); *Keefe v. Keefe*, 435 S.W.2d 313 (Mo. 1968); *Smith v. Smith*, 561 S.W.2d 714 (Mo. App.1978), and there is no evidence anywhere that he was expecting Gloria to reimburse him at any time. Gloria's share of

the payments during the marriage are presumed to have been gifts to Gloria. *Smith v. Smith, supra.* As to the period between James's and Gloria's first divorce and their remarriage in 1973 and 1974, James testified that Gladys was reimbursing him for all or most of the payments on the First Federal note. After Gladys's death, also as pointed out earlier, the property was being rented. The trial court's judgment denying contribution to James is amply supported.

Some point is made that the $6,336 is traced through two other residences into a house now owned by Gloria. We do not know the circumstances of the house's now being vested in Gloria, or what consideration James may have received therefor. The point is not developed. The trial court apparently gave it no weight. Neither do we.

The judgment of the trial court ought to be that the plaintiff Gloria Mauk Woodworth was the owner of an undivided one-fourth interest in the real estate in question, and is entitled to that percentage of the net proceeds of the sale. In all other respects the judgment is affirmed. The cause is remanded to the trial court for the entry of a new judgment.

All concur.