**In re Harlan Jerome TRUE, Debtor.**

**Helena Chemical Company, Plaintiff,**

**v.**

**Harlan Jerome True, Defendant.**

**Jere L. Loyd, Trustee, Plaintiff,**

**v.**

**Shirley True, Defendant.**

**Bankruptcy No. 01–50138–JWV.**

**Adversary Nos. 01–5018–JWV, 02–5012–JWV.**

United States Bankruptcy Court,
W.D. Missouri,
St. Joseph Division.

Nov. 4, 2002.

Stephen K. Dexter, Lathrop & Gage, Kansas City, MO, for Helena Chemical Co.

Stephen K. Dexter and Stephen B. Sutton, Lathrop & Gage, Kansas City, MO, for Jere L. Loyd, Trustee.

Scott Ross, Zahnd, Ross & Thomson, LLP, Maryville, MO, for Shirley True.

John L. Manring, St. Joseph, MO, for Harlan Jerome True.

## MEMORANDUM OPINION AND ORDER

JERRY W. VENTERS, Bankruptcy Judge.

The controversy in these Adversary Proceedings revolves around the Debtor Harlan Jerome True's alleged ownership interest in a 200–acre farm property located in Holt County, Missouri, and whether he should be denied a discharge for failing to disclose that alleged ownership interest in his bankruptcy filings.

The first of the Adversary Proceedings was filed on October 26, 2001, by Helena Chemical Company ("Helena Chemical"). Helena Chemical asserts that Debtor Harlan Jerome True ("Debtor" or "Jerome") failed to disclose his interest in the farm property and therefore should be denied a discharge pursuant to 11 U.S.C. §§ 727(a)(2) and (a)(4). The second action was filed on March 31, 2002, by the Chapter 7 Trustee, Jere L. Loyd ("Trustee"), against the Debtor's spouse, Shirley True ("Shirley"). The Trustee seeks a declaratory judgment that Jerome holds an interest in the farm property with his spouse as a tenant in common and that the farm property is property of the bankruptcy estate. If he is successful in obtaining such a judgment, the Trustee then seeks to sell Jerome's interest in the property pursuant to 11 U.S.C. § 363(b).

Because the actions involved common questions of law and fact, the Court ordered a joint trial of the Adversary Proceedings, pursuant to Rule 7042 of the Federal Rules of Bankruptcy Procedure. The trial was held at the Federal Courthouse in Kansas City, Missouri, on September 11, 2002. At the close of the trial, the Court announced that it would take the matter under advisement. The Court has reviewed the pleadings, the relevant case law, and the evidence adduced at trial and is now ready to rule.[1]

For the reasons set out below, the Court finds that the Debtor does not have an ownership interest in the real property located in Holt County, Missouri, and thus the property is not property of the estate as provided in 11 U.S.C. § 541 and the Trustee's request to sell the property must be denied. And, since the Debtor did not have an ownership interest in the property as of the commencement of the case, he could not have concealed that interest and no grounds exist for Helena Chemical's complaint objecting to discharge. Therefore, Helena Chemical's complaint pursuant to 11 U.S.C. §§ 727(a)(2) and (a)(4) must be denied as well.

## FACTUAL BACKGROUND

The present dispute has its origin in transactions that took place in 1988. Prior to 1988, Jerome was engaged in an agricultural supply business in Rock Port,

---

**1.** This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 7052, Federal Rules of Bankruptcy Procedure. This Court has jurisdiction in this matter pursuant to 28 U.S.C. § § 1334 and 157(a). This is a core proceeding arising under 28 U.S.C. § 157(b)(2)(A), (E), and (O).

Missouri, known as True Agricultural Products, Inc. ("True Agricultural") The business sold chemicals, fertilizer, and other farm supplies in the northwest Missouri area. Jerome was the sole owner. In the course of its operations, True Agricultural entered into numerous credit arrangements with its suppliers, one of whom was Helena Chemical. On March 16, 1988, Jerome entered into a Credit Sales Agreement with Helena Chemical for the purchase of agricultural products for retail sale, with an approved credit line of a maximum $100,000.00. At the same time, Jerome signed a personal guaranty in which he agreed to be personally responsible for payment of all amounts owed to Helena Chemical by True Agricultural. The line of credit was approved by Helena Chemical's credit manager on March 30, 1988. (Pl.Ex. 26)

Randy Parman, who was a salesman for Helena Chemical in 1988 and is now a regional vice president, negotiated the credit arrangements with Jerome in 1988. Parman testified that he told Jerome that he wanted Shirley to sign a personal guaranty as well, but that Jerome told him Shirley would not sign a personal guaranty because she owned separate assets from a prior marriage. Although Jerome could not recall any specific conversations with Parman, Jerome testified that when creditors would ask for Shirley's signature on a personal guaranty he would show them an antenuptial agreement—which he kept in his office safe—between himself and Shirley, to help explain why Shirley would not sign the personal guaranty. Jerome was sure he had shown the antenuptial agreement to Parman in 1988, when the credit arrangements were made. Parman, on the other hand, insisted that Jerome did not show him the antenuptial agreement. Parman said he did not learn of the existence of that agreement until this litigation was started.

Despite the $100,000.00 credit limit with Helena, True Agricultural quickly incurred a debt of some $227,000.00 to Helena Chemical, and apparently just as quickly was unable to pay the account. Helena Chemical brought suit against True Agricultural and Jerome, and in October 1988—just seven months after the credit had been originated—True Agricultural and Jerome executed a Confession of Judgment (Pl.Ex. 1) in which they confessed judgment in favor of Helena Chemical in the amount of $142,827.20. On October 12, 1988, the Atchison County (Missouri) Circuit Court entered judgment (Pl.Ex. 2) in that amount, pursuant to the Confession of Judgment.[2] This judgment was revived, pursuant to Missouri Rule of Civil Procedure 74.09, on November 7, 2000. (Pl.Ex. 3)

True Agricultural's financial problems were not confined to the delinquent account with Helena Chemical. On October 25, 1988, three other creditor-suppliers, holding accounts of more than $205,000.00, filed an involuntary bankruptcy petition against True Agricultural in the Western District of Missouri. Although the testimony was not clear on this point, apparently True Agricultural did not contest the involuntary petition and the bankruptcy proceeded to a conclusion and the business ceased to operate. It has not been shown when the debts to the petitioning creditors arose.

Nor were the financial difficulties experienced by True Agricultural in 1988 the only financial problems being experienced

2. There was no evidence to show when the state court lawsuit was filed by Helena Chemical, but in any event it would have to have

been sometime after the credit agreement was entered into in March 1988.

by the True family. For some period of time in the mid–1980s, Jerome's parents, Hiram C. True and Eloise J. True, had been having trouble paying their bills and had fallen behind in their mortgage payments to Metropolitan Life Insurance Company ("Metropolitan"), which held the first mortgage on their 200–acre farm in Holt County, Missouri, (the "farm property" or the "property") and First National Bank of St. Joseph, Missouri, ("First National") which held a second mortgage on the farm. In 1986, the Federal Deposit Insurance Corporation ("FDIC") took over First National and called the parents' second mortgage note. After some family discussions, Jerome's brother, Everett True ("Everett"), a retired Air Force brigadier general, agreed to pay off the parents' note that was then held by the FDIC. Everett paid $31,550.00 to satisfy the FDIC's note and took a second deed of trust on the farm property to secure his note.

Everett's payment of the FDIC's note was only a temporary reprieve, however. The first mortgage note held by Metropolitan was also in default, and the family realized that something would have to be done about that note or Jerome's parents would lose the farm. For a time, Everett considered taking over the farm, but then decided against it because he lived in Arizona and owned a security business requiring extensive foreign travel. According to Jerome, the family realized that, if someone else bought the farm, Hiram (age 80) and Eloise True (age 79) would have to move, and they had only Social Security benefits and a small teacher's retirement benefit with which to support themselves.

Furthermore, Jerome and Everett did not want to lose control of the farm because they had grown up there and 160 acres of the farm had been owned by the True family since 1881.[3]

Jerome recognized that, because of his own tight financial situation with True Agricultural, he could not afford to purchase his parents' farm or take over the first mortgage note to Metropolitan, which had a balance of $84,000.00.[4] Shirley and Jerome discussed their alternatives and then conferred with an attorney, and it was decided that Shirley would purchase the parents' farm in her name only. According to Jerome's and Shirley's testimony, one of the reasons they decided that Shirley should purchase the farm in her name alone was because they were concerned about environmental problems involving fertilizers and farm chemicals and they feared that Jerome could be sued in connection with the True Agricultural business, thereby putting the farm at risk if Jerome was the owner.

Shirley's first husband had died in 1979, leaving Shirley with a significant amount of assets, including substantial farm properties and cash assets.[5] Therefore, she had the ability to purchase the Trues' farm in her own right. At some point, the decision was made that Everett's second deed of trust note would be paid off in full and that Shirley would assume the Metropolitan note; Jerome had been talking with Metropolitan about such an assumption and had provided Metropolitan with financial statements for himself and Shirley. After reviewing the situation, Metropolitan agreed to this arrangement. (Pl. Ex. 15E)

---

3. The remaining 40 acres were purchased by Hiram and Eloise True sometime in the early 1980s.

4. The original loan was for $96,000.00.

5. Shirley and Jerome were married in 1981. Shirley had a financial statement dated October 1, 1987, showing a net worth of more than $438,000.00. (Pl.Ex. 15D)

To effect the purchase, Shirley had a ready $15,000.00 available, but would have been required to liquidate other investments to raise the additional $16,550.00 required to satisfy Everett's note. In an effort to help Shirley, Jerome borrowed $3,000.00 from True Agricultural and removed $10,000.00 from a savings account in his name only (funds that he had received from liquidation of a trust in Iowa). Jerome testified that he gave this money to Shirley because he knew that buying the farm was "a burden" for her because she would have to liquidate assets to make the purchase if he did not help her and because she would be assuming the debt to Metropolitan. Both Jerome and Shirley testified that, in addition to purchasing the farm, Shirley also undertook the responsibility to help Hiram and Eloise True with payment of their utility bills as long as they were able to continue living on the farm. Jerome testified that he gave the $13,000.00 to Shirley to help compensate her for the anticipated payment of future utility bills for his parents.[6] The balance (i.e., $2,625.90) of the money needed to pay Everett's note came from the joint funds of Jerome and Shirley.

Therefore, of the $31,550.00 required to pay Everett's note, Shirley contributed $16,312.95 (assuming the joint funds are allocated equally) and Jerome contributed $15,237.05. All of the funds contributed by Jerome and the jointly owned funds contributed by Jerome and Shirley were turned over to Frank H. Strong, Jr., a Maryville attorney who handled the transaction for the Trues. When the transaction was closed in March 1988, Strong wrote a check to Everett for $16,550.00 on his trust account and Shirley issued her personal check to Everett for the other $15,000.00.

Hiram and Eloise True conveyed the property to Shirley by General Warranty Deed executed on February 27, 1988, and recorded on March 30, 1988. (Pl.Ex. 5) The deed stated that it was subject to the existing deed of trust in favor of Metropolitan, but did not contain any language indicating that Shirley was assuming the Metropolitan indebtedness or that she would hold the Trues harmless on it. In fact, Metropolitan did not release the Trues from liability on the note and did not enter into any kind of agreement with Shirley for assumption or payment of the note. The deed also reserved a life estate to Hiram and Eloise True, expressly permitting them to live in the house on the property "and to have free access to the property during their natural lives," including the use of a well and existing water and electrical lines.

After purchasing the property, Shirley opened a bank account in the name of True Farms and conducted all business with respect to the farm through that account. Shirley and her stepdaughter (Jerome's daughter) were signatories on the account; Jerome was not a signatory. (Def.Ex. C) Shirley custom farmed the property—that is, she bought all seed and fertilizer and other supplies required and hired area farmers or workmen to apply them and to plant and harvest the crops. Shirley kept the books and records for the farm, though an accountant prepared the necessary tax returns. When money was needed to run the farming operations, Shirley borrowed money in her name only. (Def.Exs.E–I) Government support and other payments were made to Shirley in

---

**6.** Shirley testified that she helped pay the Trues' utility bills for several years before they went to live in a nursing home. She stated that she paid approximately $25,000.00 in utility bills, and that the Trues reimbursed her for about $7,000.00 of that.

her name only and under her Social Security number. (Def.Exs.J–T)

With respect to the True Farms checking account, Jerome made only two deposits of his own funds into the account, according to Shirley: $2,500.00 that Jerome received from his father's estate and $10,000.00 that Jerome received when he cashed out a life insurance policy. What is not clear is whether Jerome later removed those funds from the account for his own use or whether those funds were used to pay the operating expenses or mortgage payments for the farm. Between April 1997 and April 2001, Jerome received nine checks from the account totaling $1,150.00. (Pl.Ex. 17) Jerome testified that these checks—ranging in amounts from $100.00 to $200.00—were to compensate him for mowing, painting, and other chores he performed on the farm.

Jerome and Shirley filed joint state and federal income tax returns for all years after the farm property was transferred to Shirley. On the federal returns from 1991 through 2000 (the only years for which returns were introduced in evidence), income and expenses for the farm were reported on Schedule F and included in the total income of the Trues. On the Missouri state tax returns, which require that a couple's total income be allocated between the husband and wife, the farm income was allocated to Shirley except for one year, 1996, when it was split equally between Jerome and Shirley. (Pl.Ex. 18–23; Def. Ex. BB–EE). Shirley testified that the allocation made in 1996 was erroneous, that the error was made by their accountant, and that Shirley failed to detect the error. Jerome and Shirley did not have any agreement for allocation of the federal taxes between them; the couple simply paid the taxes that were due out of their joint income, without regard to the fact that the bulk of the income was being attributed to Shirley on the state tax returns.

In February 1996, Shirley sought and obtained an informal extension on the Metropolitan loan, based on her personal financial statement, which showed a net worth of $660,944.00. In recommending approval of the extension, the manager handling the request noted that "the borrower [Shirley] is in excellent financial circumstances." (Def.Ex. II) The farming operations did not always produce sufficient income to make the mortgage payments to Metropolitan. On one occasion, Shirley received $50,000.00 from the sale of another asset and deposited that money in the True Farms account, and that money was used to help pay the mortgage. The Metropolitan note was paid in full in early 1999. (Def.Exs.GG, HH)

Helena Chemical and the Trustee contended that Jerome was insolvent when he gave Shirley money to purchase the property. When Jerome applied for a line of credit with Helena Chemical in March 1988, he gave Parman a January 31, 1988, financial statement showing that Jerome had total assets of $367,500.00 and a net worth of $331,758.44. (Pl.Ex. 26) Apparently, this financial statement was erroneous to the extent that it failed to include a personal liability to the Tennessee Valley Authority in the approximate amount of $119,870.00. (Pl. Exs. 28 and 29C) However, if this debt was included on Jerome's financial statement, he would still have had a net worth in excess of $200,000.00. A December 1, 1987, financial statement showed that Jerome had a net worth of $378,418.94, (Pl.Ex. 15C) but it also failed to include the personal liability to the Tennessee Valley Authority. As for Jerome's company, True Agricultural, there were also somewhat inconsistent financial statements. A balance sheet statement for True Agricultural dated December 31,

1987, showed that True Agricultural had a negative net worth of $23,290.34. (Pl.Ex. 14H), but another financial statement for True Agricultural dated January 31, 1988, which was given to Helena Chemical's salesman when the company applied for credit in March 1988, showed that the company had a positive net worth of $182,920.74. (Pl.Ex. 31) None of this evidence was sufficient, however, to show that Jerome was personally insolvent in March 1988.

On July 15, 1999, Shirley, as Grantor, executed a Beneficiary Deed conveying the farm property at her death to Beth A. True and Ted A. True, Jerome's children. (Pl.Ex. 9) At the same time, Shirley also executed a Beneficiary Deed conveying the property she had inherited from her first husband to her two children from her first marriage. (Pl.Ex. 10) In both instances, Jerome signed the deeds for the express purpose of indicating his consent to the transfers.

The Debtor filed his bankruptcy petition pursuant to Chapter 7 of the Bankruptcy Code on February 23, 2001, and these Adversary Proceedings followed. Additional facts will be developed as necessary in the Discussion section that follows.

## DISCUSSION

Because the outcome of these cases turns in the first instance on whether Jerome acquired an ownership interest in the Holt County farm property, the Court will deal with the Trustee's claims first.

### A. The Trustee's claim that the farm is property of the estate.

The Trustee claims that Jerome acquired an ownership interest in the Holt County farm property because he provided part of the money required for the purchase of the property at a time when he was married to Shirley True. Accordingly, the Trustee asserts that Jerome's interest in the property is property of the bankruptcy estate pursuant to 11 U.S.C. § 541 and seeks authority to sell that property pursuant to 11 U.S.C. § 363 of the Bankruptcy Code. Jerome and Shirley, however, assert that Jerome's contribution toward the purchase price was a gift to Shirley, and that therefore the property was Shirley's sole property and did not become property of Jerome's bankruptcy estate.

Under § 541(a)(1) of the Bankruptcy Code,[7] a bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."[8] The Eighth Circuit has recognized that "[t]he legislative history of this section clearly establishes Congressional intent that the bankruptcy estate be as all-encompassing as the language indicates." *In re Graham*, 726 F.2d 1268, 1270 (8th Cir.1984). This Court has exclusive jurisdiction to decide whether certain property is property of the bankruptcy estate. 11 U.S.C. § 541; 28 U.S.C. § 1334(d). "Although the question of what is property of the estate under Section 541(a) is a federal question, property rights are created and defined by state law." *Cooper v. Frederes (In re Frederes)*, 141 B.R. 289, 291

---

**7.** Title 11, United States Code.

**8.** Section 541(a)(1) of the Bankruptcy code provides: (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and my whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case. 11 U.S.C. § 541(a)(1).

(Bankr.W.D.N.Y.1992)(citing *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979)). Therefore, Missouri law governs whether the Debtor has any ownership interest in the property.

The Trustee advances three arguments in support of his claim that Jerome had an ownership interest in the farm property and that it is, therefore, property of the bankruptcy estate.

### 1. Missouri common law

The Trustee's principal argument is that Jerome acquired an interest in the farm property pursuant to Missouri's common law. He contends that, although the farm property was titled to Shirley only, Jerome has an ownership interest in the farm property by virtue of his marriage to Shirley because Jerome contributed a portion of the purchase price for the property and that contribution was not a gift. The Trustee argues that, under Missouri common law, a husband holds a vested interest in property that is separately titled in the name of his wife. He relies principally on *Conrad v. Howard,* 1 S.W. 212, 214, 89 Mo. 217 (Mo.1886) ("At common law,...the...property of the wife...vest immediately and absolutely in the husband by the marriage...") and *McCoy v. Hyatt,* 80 Mo. 130, 1883 WL 9962, at \*3 (Mo. Oct. Term, 1883) ("Under common law the acquisitions of the wife enured to the benefit of the husband...").

On the other hand, Shirley True, the sole defendant in the Trustee's adversary action, argues that the farm property was and is Shirley's separate property by virtue of the provisions of Mo. REV. STAT. § 451.250(1)(CUM.SUPP.1988). Section 451.250(1), which is known as the Married Women's Act, states in pertinent part:

1. All real estate and any personal property, including rights in action, belonging to any woman at her marriage, or which may have come to her during coverture, *by gift, bequest or inheritance, or by purchase with her separate money or means,* or be due as the wages of her separate labor, or has grown out of any violation of her personal rights, shall, together with all income, increase and profits thereof, be and remain her separate property and under her sole control, and shall not be liable to be taken by any process of law for the debts of her husband.

§ 451.250(1) (emphasis added)

Shirley argues that she acquired the farm property by using her own separate funds and by using the funds given to her by Jerome as a gift, and therefore the property is her separate property.

Since the enactment of the Married Women's Act (previously Section 3390, RSMo 1939), the right of a married woman to acquire property by gift from her husband has been changed from an equitable right to a legal right, and a gift of personal property from the husband to the wife is considered valid, generally speaking, in all respects and for all purposes. *Kidd v. Kidd,* 216 S.W.2d 942, 944 (Mo.App.1949). The purpose of the statute is to enable a married woman to own property in her own name and to retain the fruits of her labor. *Brawner v. Brawner,* 327 S.W.2d 808, 811 (Mo.1959), *overruled on other grounds by Townsend v. Townsend,* 708 S.W.2d 646 (Mo.1986).

However, the essentials of a gift must be present and proven in order for this exception to the common law to apply. *Kidd,* 216 S.W.2d at 944. The essential elements of an inter vivos gift are (1) a present intention of the donor to make a gift, i.e. donative intent; (2) delivery of the property to the donee by the donor, and (3) acceptance by the donee whose owner-

ship takes effect immediately and absolutely. *Duvall v. Henke,* 749 S.W.2d 714, 716 (Mo.App.1988); *Wilson v. Wilson,* 642 S.W.2d 132, 134 (Mo.App.1982); *Gross v. Gross,* 625 S.W.2d 655, 662–63 (Mo.App. 1981); *Kidd,* 216 S.W.2d at 944–45 ("there must be a voluntary, gratuitous, and absolute transfer of the property from the husband to his wife, effective immediately, and fully executed by delivery to and acceptance by her"). The party claiming that an inter vivos gift exists or was made has the burden of proving the elements of a gift by clear, cogent and convincing evidence. *Duvall,* 749 S.W.2d at 716; *In re Estate of Wintermann,* 492 S.W.2d 763, 767 (Mo.1973). If the provisions of the Married Women's Act are satisfied, the rights of the husband at common law in the property of his wife "forthwith perish." *Gilliland v. Gilliland,* 96 Mo. 522, 10 S.W. 139, 140 (1888).

■ In this case, the Court is convinced that Jerome's contribution of $15,237.50 of his own funds to Shirley to enable her to purchase the Holt County property belonging to Jerome's parents was a gift, and therefore the property was separately acquired by Shirley as her own property pursuant to § 451.250(1). All of the elements necessary to find a valid inter vivos gift are present.

First, the Court, having heard the testimony and having observed the demeanor of the Debtor and his wife, is convinced that Jerome intended to give the funds to Shirley as a gift so as to enable her to purchase the property in her own name and to help care for his parents while they lived on the family farm. Jerome obtained a $3,000.00 loan from his company, True Agricultural, and gave that money to the Trues' attorney, Mr. Strong, for use in purchasing the property. Likewise, Jerome withdrew over $10,000.00 from a savings account in his name alone and gave that money to Mr. Strong for the purchase price. Had Jerome not intended these funds to be a gift, he surely would have insisted that his name be included on the title to the property or that there be some other *quid pro quo* for his contribution. But there was no evidence that the gift was in any way conditional or that there were strings attached. The Trues had consulted an attorney and had been advised that title to the property should be held in Shirley's name only, so Jerome was well aware at the time of the transaction that he would not have any legal interest in the property. Nevertheless, he contributed $13,000.00 of his own money to the purchase of the property.[9]

Second, Jerome delivered the $13,000.00 he had obtained from his personal assets and his share of $2,625.90 in jointly owned funds to Mr. Strong for the express purpose of enabling Shirley to purchase the farm property. The Trustee makes much of the fact that the money was delivered to Mr. Strong and placed in his trust account

---

**9.** The timing of events is important in the Court's view. Mr. Strong wrote a letter to Hiram and Eloise True on January 26, 1988, telling them that Jerome and Shirley would explain "why the purchase is made by Shirley and not by them jointly," and "you will find out why I am recommending that, at this time." (Pl.Ex. 14D) Knowing that this would be the situation, Jerome nevertheless withdrew $10,924.10 from his savings account on February 29, 1988, (Pl.Ex. 14C)—over a month later—and obtained $3,000.00 from

True Agricultural on March 8, 1988 (Pl.Ex. 14A)—some six weeks after Mr. Strong's letter—and contributed those amounts to the purchase price. This is persuasive evidence that Jerome knew what he was doing when he gave Shirley—through Mr. Strong—the money. Specific language is not required to reflect present intent to make a gift; the donor's intent can be gleaned from the circumstances surrounding the transaction. *Duvall,* 749 S.W.2d at 716.

rather than being delivered directly to Shirley, and suggests that this defeats Jerome's intent to make a gift to Shirley. The Court is not persuaded by that argument. If that were the law, many gifts made in the United States could be rather easily defeated. Many gifts are made by the delivery of money or documents to a third party, such as a bank or brokerage company or an attorney, for the benefit and use of a particular beneficiary. Many gifts or transfers are now made electronically, and there is no actual "delivery" to the donee at all. Such gifts are not rendered ineffective because they have not been delivered directly to the donee. The Trustee's argument exalts form over substance. *Wintermann,* 492 S.W.2d at 768 (Court found that delivery may be actual, constructive, or symbolic and that no particular form is necessary to effect delivery).

Third, there can be little if any dispute that Shirley accepted the money Jerome gave her, because she promptly used that money to purchase the parents' farm property, and the farm property was titled in her name and her name alone. Thus, her ownership of the donated funds took effect immediately and absolutely.

Subsequent events and circumstances also make it clear that Jerome intended that the farm would belong to Shirley as her separate property. Prior to their marriage in 1981, Jerome and Shirley had entered into an antenuptial agreement that recognized that Shirley owned substantial property of her own and that she might acquire additional property during the marriage that could and would be considered as her separate property. Jerome was well aware of this; he supposedly kept a copy of the antenuptial agreement in his office safe and showed it to creditors as explanation for Shirley's refusal to sign personal guaranties with respect to Jerome's business. After she acquired the property, Shirley opened a separate bank account and paid all expenses of the farm out of that account. Jerome did not have access to that account, and the testimony reflected that he received only $1,150.00 from the account over a period of four years, representing payment for work he did on the farm. Shirley paid off the first mortgage debt to Metropolitan with income generated by the farming operations and with separate funds of her own that were derived from the sale of other assets which she owned in her own name. For example, in 1990, Shirley liquidated other, separate assets and paid $50,000.00 to Metropolitan. (Pl.Ex. 7) All Government support payments were made to Shirley under her Social Security number, and loans to finance the farming operations were obtained by Shirley in her name only. She kept the books and hired the people to plant and harvest the crops. With the exception of 1996, when their accountant apparently erred, all of the farm income was reported and taxed as Shirley's separate income on the Missouri tax returns.[10]

10. The Trustee argues that the intent to make a gift was defeated, at least in part, by the fact that the Trues included the farm income on their jointly filed federal tax returns. This, the Trustee contends, means that Jerome was actually considered by the Trues as being a joint owner of the property and that he was receiving the benefits of the property along with Shirley. This argument is unpersuasive, because a jointly filed federal tax return does not allow for the separation of income between spouses, as the Missouri state income tax return does. To separate their income under the Internal Revenue Code, the Trues would have had to file separate tax returns, which more than likely would have resulted in their paying substantially higher taxes. The Court is more persuaded by the separation of the income on the Missouri tax returns; by signing those returns, Jerome in effect validated the gifts he had made to Shirley with respect to the farm property.

The Trustee points to two other circumstances that, in his view, suggest that Jerome did not actually intend that the farm would be his wife's separate property. One of these was the decision to place the property in Shirley's name only because of the Trues' fear that Jerome might be sued in connection with his sale, through True Agricultural, of hazardous farm chemicals and other supplies, and that such lawsuits (if filed) could potentially place the farm at risk if Jerome had an ownership interest in it. The second circumstance was the fact that Shirley executed a Beneficiary Deed in July 1999 (Pl.Ex. 9) conveying the farm to Jerome's two children. This, the Trustee argues, suggests that Shirley never regarded the property as her own and that she was merely protecting it, in effect, for Jerome's family, particularly his children.

The Court does not believe that Jerome's donative intent was defeated by these circumstances. The decision to place the farm in Shirley's name to protect it from the claims of potential judgment creditors—on the basis of potential environmental or similar claims—was a business decision that was arrived at after consultation with their attorney. Jerome knew of, and participated in, this decision before he gave Shirley the money to purchase the property. Nevertheless, he gave her the money. The specter of lawsuits and adverse judgments, without more, should not defeat Jerome's donative intent.[11]

As for the fact that Shirley has now executed a Beneficiary Deed to convey the farm to Jerome's children upon Shirley's death, that fact likewise does not detract from Jerome's intention to make a gift. The Beneficiary Deed was executed more than 11 years after Shirley acquired the property, and after she had completed paying the mortgage on it. If the deed had been executed shortly after Shirley acquired the property, the Court would consider this circumstance much differently, but that is not the case. A gift is not defeated because the donor anticipates that the donee will make a certain disposition of the property at some later date. For example, heirloom jewelry is often given to a spouse with the understanding that the spouse will, at or before her death, give the jewelry to a favored child; such an understanding would not defeat the donor's intent to make a gift. The Trustee has produced no evidence that Jerome and Shirley had an agreement that the farm would be given to Jerome's children, although there was substantial evidence that, in purchasing the property, they hoped that the farm could be kept in the family. Moreover, Shirley has the right to revoke the Beneficiary Deed at any time, and could decide (after Jerome's death, for instance) to give the farm to someone else. See Mo. Rev. Stat. § 461.033.[12]

Under all of the circumstances, the Court is convinced that Jerome intended to make a gift of money to Shirley so that she could buy Hiram and Eloise's farm property and to enable Hiram True and

11. There was no showing that any such lawsuits were ever filed against Jerome or his business.

12. Section 461.033.1, as it existed at the time the beneficiary deed was executed, provided:
    1. A beneficiary designation may be revoked or changed in whole or in part during the lifetime of the owner. A revocation or change of a beneficiary designation involving property of joint owners may only be made with the agreement of all owners then living.
    2. A subsequent beneficiary designation revokes a prior beneficiary designation unless the subsequent beneficiary designation expressly provides otherwise. Mo. Rev. Stat. § 461.033 (Cum.Supp.1999).

Eloise True to live on their family farm—which had been owned by the True family for more than 100 years—until they were no longer physically able to care for themselves. Shirley has owned and operated the farm as her separate property for more than 14 years, and in that time Jerome has done nothing to indicate that he has an ownership interest in the property. The Court believes that Shirley acquired the farm property with her separate funds and with the money given to her by Jerome as a gift, and that under the provisions of the Married Women's Act, § 451.250(1), the property is Shirley's separate property and is not property of Jerome's bankruptcy estate.

**2. Resulting Trust**

Secondly, the Trustee argues that the money that Jerome contributed towards the purchase price of the farm created an ownership interest in the property under a resulting trust theory. Under Missouri law, a resulting trust may arise when the consideration for purchase of a property is supplied by one party but the title is conveyed in the name of another. *Dallmeyer v. Dallmeyer,* 274 S.W.2d 250, 254 (Mo.1955). However, where a husband provides the consideration and title is conveyed to his spouse, a rebuttable presumption of a gift to the spouse arises which will negate finding a resulting trust. *Id.* "It is the law that where a husband pays the purchase price and causes title to property to be transferred to his wife, a rebuttable presumption arises that the husband intended to make a gift to or a provision for the benefit of his wife and the burden to prove that he did not so intend was and in [sic] upon him." *Hovey v. Hovey,* 379 S.W.2d 621, 625 (Mo.1964). A resulting trust must arise, if at all, at the moment the title passes. "It cannot be created by subsequent occurrences." *Dougherty v. Duckworth,* 388 S.W.2d 870, 874 (Mo.1965). Furthermore, the burden rests with the party seeking the establishment of a resulting trust to prove its existence "by clear and convincing evidence to exclude all doubt from the mind of the court." *Ham v. Ham,* 691 S.W.2d 944, 945 (Mo.App.1985). In this case, that burden would fall on the Trustee, standing in the shoes of Jerome, the Debtor.

For the reasons already set out hereinabove, the Court has determined that Jerome's contributions toward the purchase price of the farm were intended and were effective as a gift to Shirley. The Trustee has not produced any evidence sufficient to overcome the presumption that Jerome intended his contributions to be a gift. As already discussed, Jerome willingly provided $15,237.05 of his own funds to Shirley so that she could purchase Jerome's parents' farm property, knowing that the property would be titled in Shirley's name only. Jerome has not asserted that he has any ownership interest in the property. Shirley has paid for the property and has managed the property as her own separate property.

In *Gilliland v. Gilliland,* 96 Mo. 522, 10 S.W. 139 (1888), a subsequent creditor attempted to reach the proceeds of a tract of land that had been purchased by the husband with his own funds but titled in the wife's name alone, somewhat similar to the situation in the instant case. The Missouri Supreme Court had no difficulty in finding in favor of the wife. "The purchase money being furnished by the husband for the purchase of the Vernon county land, and the conveyance being made to her at his instance, the transaction is *prima facie* an advancement, and rebuts the resulting trust that would otherwise arise in favor of him who pays the money." *Id.,* at 140. Since the husband did not have any interest in the property and could not have

reached the proceeds resulting from the sale of the property in any event, "his creditors could not do more than he could," and were likewise barred from reaching the property. *Id.* Such is the case here, and the Court finds that the Trustee has failed to rebut the presumption that Jerome's contributions were a gift to Shirley.

### 3. The Debtor was insolvent at the time of the conveyance.

■■■ Finally, the Trustee contends that Jerome was insolvent at the time of the gift and this fact negates donative intent. There would seem to be little room for argument that the transfer of property—even between spouses—for the purpose of defeating creditors should not be permitted. The Trustee has directed the Court's attention to *In re Estate of Evans*, 614 S.W.2d 315, 316–17 (Mo.App.1981) (observing that a transfer made for the purpose of placing assets beyond the reach of creditors is not one made with donative intent and therefore is not a gift); *Dawes v. Williams*, 40 S.W.2d 644, 328 Mo. 680 (1931) (concluding that, although the real estate in question had been acquired with funds belonging to the husband, it had been placed in the wife's name for the mere purpose of avoiding his creditors and would therefore be subjected to a lien in the creditors' favor); and *McGregor–Noe Hardware Co. v. Horn*, 146 Mo. 129, 47 S.W. 957 (1898) (where the husband contributed a part of the purchase price of the property at a time when he was insolvent, he acquired an equitable interest in the property to the extent of his contribution).[13]

While the Trustee's characterization of the law may well be correct, his difficulty is that the facts do not provide him the support he needs to carry the day. Despite a valiant effort, the Trustee did not convince the Court that Jerome was insolvent when he transferred the $15,237.05 to Shirley to enable her to purchase the property. When Jerome applied for a line of credit with Helena Chemical in March 1988, he provided Parman, Helena Chemical's salesman, with a January 31, 1988, financial statement showing that Jerome had total assets of $367,500.00 and a net worth of $331,758.44. (Pl.Ex. 26) Apparently, this financial statement was erroneous to the extent that it failed to include a personal liability to the Tennessee Valley Authority in the approximate amount of $119,870.00. (Pl. Exs. 28 and 29C) However, if this debt was included on Jerome's financial statement, he would still have had a net worth in excess of $200,000.00 shortly before he gave Shirley the $15,237.05 in March. Obviously, the gift of that sum to Shirley did not render Jerome insolvent. The Trustee also had admitted in evidence a December 1, 1987, financial statement which showed that Jerome had a net worth of $378,418.94, (Pl.Ex. 15C) which again does not aid the Trustee, even if the debt to the Tennessee Valley Authority is included. Finally, a balance sheet statement for Jerome's company, True Agricultural, dated December 31, 1987, showed that True Agricultural had a negative net worth of $23,290.34. (Pl.Ex. 14H) However, this exhibit does not prove that Jerome *personally* was insolvent; in fact, it does not conclusively prove that his company was

---

13. "If the donor at the time is indebted to the extent of insolvency, the conveyance is void. A gift by a person unable to pay his debts so directly and inevitably tends to delay and hinder creditors, and so plainly violates the moral duty of honesty, that the least regard to fair dealing and integrity renders it necessary to pronounce it void.... If the donor is insolvent, the only question is whether or not a conveyance is voluntary, and if it is voluntary, it is void as against creditors." *Snyder v. Free,* 21 S.W. 847, 849, 114 Mo. 360 (1893) (*quoting* Bump, Fraud. Conv. (3d Ed.), 280–81).

insolvent. In contrast, another financial statement for True Agricultural, dated January 31, 1988, which was given to Helena Chemical's salesman when the company applied for credit in March 1988, showed that the company had a positive net worth of $182,920.74. (Pl.Ex. 31) [14]

It is not necessary for the Court to attempt to reconcile the differences and discrepancies in the various financial statements and balance sheets; in fact, they likely are irreconcilable. Certainly, they raise suspicions about the accuracy of information that Jerome was providing to his creditors and others at that time. However, they do not demonstrate that he was insolvent. The Trustee had the burden to prove insolvency, and he failed to do so. Nor has the Trustee produced any evidence that would show that Jerome transferred the $15,237.05 to Shirley in an attempt to hinder, delay, or defraud his creditors, either actual or potential. There has been no showing that Jerome was not paying his personal bills in a timely fashion in March 1988 or that he was being sued or otherwise pursued by his creditors at that time.

For all of the foregoing reasons, the Court finds that the contributions Jerome made to Shirley for purchase of the farm property of Jerome's parents were intended and were effective as a gift to Shirley, that the farm property was Shirley's separate property, that Jerome had no interest in that property at the time he filed his bankruptcy petition, and that therefore the property is not property of the bankruptcy estate. Accordingly, the Trustee will be denied the relief he seeks.

### B. Helena Chemical's claim that Jerome concealed assets.

■ Helena Chemical, the only creditor in Jerome's case, objects to Jerome's discharge pursuant to 11 U.S.C. §§ 727(a)(2) and (a)(4) on grounds that Jerome concealed his interest in the farm property from his creditors and from the Trustee in his bankruptcy proceedings.[15]

11 U.S.C. § 727(a)(2)(A) provides:

(a) The court shall grant the debtor a discharge, unless–

\*        \*        \*        \*        \*        \*

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of

**14.** At trial, Helena Chemical expended considerable time and energy demonstrating that Jerome had provided inconsistent and perhaps inaccurate financial statements to Helena Chemical and others. Parman testified that Helena Chemical might not have extended the credit it did to True Agricultural if it had known the company's and Jerome's true financial condition. For example, the testimony showed that Jerome had given Metropolitan Life Insurance Company a personal financial statement dated December 1, 1987, in which he represented that True Agricultural had a *market value* of $325,802.19, whereas he provided Helena Chemical with a financial statement for True Agricultural dated January 31, 1988, (just two months later) which showed the company had a *book net worth* of just $182,920.74. There can be, of course, considerable difference between a company's

market value and its book net worth, and both of the referenced statements could well have been accurate. However, prolonged discussion of this testimony is not required because the testimony was largely irrelevant. This is not an action to deny discharge of Jerome's indebtedness to Helena Chemical on the basis of false or fraudulent financial statements pursuant to 11 U.S.C. § 523(a)(2)(B).

**15.** In its Amended Complaint, Helena Chemical also asserted that Jerome had failed to disclose his interest in three other properties that were purchased after Jerome and Shirley were married and that were titled in Shirley's name alone. Helena Chemical presented no evidence at trial concerning these other properties. Therefore, those claims are deemed abandoned.

property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–

(A) property of the debtor, within one year before the date of filing of the petition.

11 U.S.C. § 727(a)(2)(A).

Section 727(a)(4) of the Bankruptcy Code states:

(a) The court shall grant the debtor a discharge, unless—

\*      \*      \*      \*      \*      \*

(4) the debtor knowingly and fraudulently, in connection with the case—

(A) made a false oath or account.

11 U.S.C. § 727(a)(4).

■ Given the findings by the Court that the farm is not property of the estate, Helena Chemical's complaint requires little discussion. First, the Court has found that Jerome made a gift of money to his wife for the purchase of the farm property, and that the transfer of funds was not made to hinder, delay, or defraud Jerome's creditors. It necessarily follows that his nondisclosure of the transfer on his bankruptcy schedules—filed some 14 years later—was not violative of the statute. Secondly, the Court has found that the property was Shirley's separate property and thus did not become property of Jerome's bankruptcy estate. Therefore, it could not be a violation of the statute for Jerome to fail to list an interest in the property on his schedules. A debtor cannot be denied a discharge for "concealing" property that does not, in fact, belong to the bankruptcy estate. For these reasons, Helena Chemical must be denied the relief sought in its Complaint.

ORDER

Therefore, it is

**ORDERED** that the Trustee's Complaint for Declaratory Judgment and Order of Sale Under Section 363 be and is hereby DENIED. It is

**FURTHER ORDERED** that the Amended Complaint Objecting to and to Deny Discharge of the Debtor Pursuant to Section 727(a) filed by Helena Chemical Company be and is hereby DENIED.